IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

VINCENT MAIORINO, :
Plaintiff, :
-against- : **SECOND AMENDED VERIFIED COMPLAINT**

CITY OF NEW YORK, :
Defendant. : **JURY TRIAL DEMANDED**
--------------------------------X

Plaintiff, VINCENT MAIORINO, through Counsel, states for his Second Amended Verified Complaint as follows:

**PRELIMINARY STATEMENT**

1. This case challenges the City of New York's unconstitutional and discriminatory policy of denying religious accommodation requests to the COVID-19 Vaccine Mandate from employees whose objections were based on religious opposition to abortion or adherence to Catholic doctrine.

2. Under the City's policies and practices, Catholic employees were categorically denied accommodations because the Pope had publicly expressed support for vaccination, and Catholic employees asserting religious opposition to abortion were rejected on the ground that their beliefs were "personal" rather than religious, as well as factually incorrect. These policies stripped employees of the individualized assessment of sincerity and feasibility that both the Constitution and civil-rights laws require.

3. Plaintiff, Vincent Maiorino, a lifelong practicing Catholic and fifteen-year Sanitation Worker, submitted a timely request for a religious accommodation in accordance

with City procedures, and then a detailed appeal explaining that his religious convictions prohibit receipt of the COVID-19 vaccine because it was created using aborted fetal cell lines. The City nevertheless denied his request through a process infected by bias and predetermined criteria that disfavored Catholic and pro-life applicants.

4. By substituting institutional views of church leadership for individual belief, and by rejecting abortion-based religious objections on the erroneous premise that such beliefs were neither religious nor factually valid, the City's policy violated the Free Exercise Clause, the New York State Human Rights Law, and the New York City Human Rights Law. This action seeks to hold the City accountable for its unlawful and discriminatory practices and to vindicate the fundamental right of all employees to be judged by the sincerity of their own faith, not the public statements of religious authorities or the City's moral preferences.

## PARTIES

5. Plaintiff is a citizen of the United States and a resident and domiciliary of Orange County, State of New York.

6. Plaintiff was a Sanitation Worker who was employed by DSNY and the City of New York.

7. Plaintiff was terminated on February 11, 2022, because DSNY and the City of New York refused to reasonably accommodate his religious beliefs.

8. Plaintiff, Mr. Maiorino's sincerely held religious beliefs as a Roman Catholic require him to refuse the COVID-19 vaccine because, among other religious reasons, they are produced, developed, and/or tested with aborted fetal cell lines.

9. New York City Department of Sanitation is an agency of the Defendant City of New York and municipal corporation duly organized and existing under and by virtue of the Laws of the State of New York.

10. The New York City Department of Sanitation's principal office is located at 125 Worth Street, New York NY 10013.

11. Defendant City of New York is a municipality organized and existing under the laws of New York State.

12. The City of New York was and is responsible for the policy, practice, supervision, and conduct of its Officers and Agencies at all relevant times hereto. The City of New York's principal office is located at 1 Centre Street, New York NY 10007.

13. At all times herein mentioned, Defendant has been an "employer" as defined by the NYSHRL (N.Y. Exec. Law § 292(5)) and the NYCHRL (N,Y.C. Admin. Code § 8-102).

14. At all times herein mentioned, Defendant NYC employed no fewer than fifteen (15) persons.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction under 42 U.S.C § 1983 and 28 U.S.C. §§ 1331 and 1343.

16. Plaintiff further invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. §1367 to hear claims so related under the New York State Human Rights Law and the New York City Human Rights Law.

17. Venue is proper in this district under 28 U.S.C. §1391(b) because Defendant maintains a principal place of business within this District and a substantial part of the events giving rise to the cause of action arose here.

## STATEMENT OF FACTS

18. Plaintiff, Mr. Maiorino , (hereinafter "Plaintiff" or "Mr. Maiorino ") was employed as a Sanitation Worker for DSNY from approximately May 30, 2005, up until his wrongful termination on February 11, 2022.

19. Mr. Maiorino was employed by DSNY and the City.

20. Mr. Maiorino was a senior employee in his district.

21. Mr. Maiorino was a dedicated public servant for over fifteen years.

22. Plaintiff is a practicing Roman Catholic ("Catholic").

23. Plaintiff received his Catholic Sacraments including Baptism, Penance, Communion, Confirmation and Holy Matrimony.

24. Plaintiff refuses all vaccinations based on his sincerely held Catholic religious beliefs.

25. Plaintiff refuses COVID-19 vaccines in particular because he believes that they go against his conscience.

26. Plaintiff is a practicing Roman Catholic who objected to receiving a COVID-19 vaccine based on a sincerely held religious belief rooted in Catholic doctrine.

27. Specifically, Plaintiff's objection arises from the dictates of conscience—recognized by the Catholic Church as the voice of God speaking to the individual soul.

28. According to the *Catechism of the Catholic Church*, which codifies the official doctrine of the Catholic faith:

> "Deep within his conscience man discovers a law which he has not laid upon himself but which he must obey. Its voice, ever calling him to love and to do what is good and to avoid evil, sounds in his heart at the right moment. . . . For man has in his heart a law inscribed by God. His conscience is man's most secret core and his sanctuary. There he is alone with God whose voice echoes in his depths."

(*Catechism of the Catholic Church*, § 1776, Article 6, "Moral Conscience").

29. Conscience is not merely a personal preference; it is an essential component of Catholic teaching and binding doctrine.

**<u>Covid 19 and the City's Vaccine Mandate</u>**

30. In early 2020, COVID-19 began circulating in New York City.

31. In March of 2020, the Governor of New York State issued an executive order closing "nonessential" business.

32. As an "essential worker" Mr. Maiorino worked throughout the COVID-19 pandemic person, for approximately two years.

33. For a significant period during this time, the Defendant did not provide Mr. Maiorino and other DSNY employees with Personal Protective Equipment, such as masks and gloves, or hand sanitizer.

34. Defendant never trained or taught DSNY employees how to remain safe while working during the COVID-19 pandemic.

35. On September 13, 2021, the Defendant implemented the City's policy which required all DSNY employees to either submit weekly negative COVID-19 PCR test results or provide proof of vaccination in order to work.

36. On October 20, 2021, Dr. Dave Chokshi, the New York City Commissioner of Health and Mental Hygiene, issued an Order ("Vaccine Mandate") requiring employees of New York City ("City Workers") to receive a COVID-19 vaccine by October 29, 2021.

37. The Order stated in pertinent part: "Nothing in this Order shall be construed to prohibit any reasonable accommodation otherwise required by law." The Order explicitly

provides for reasonable accommodations to the vaccination requirement for employees with either medical or religious objections.

38. Pursuant to the Order, employees seeking reasonable accommodation were required to submit such requests to their agency's Equal Employment Opportunity (EEO) Officer no later than October 27, 2021.

39. The Order further provided that if an employee's request for reasonable accommodation was denied, the employee had a right to appeal that denial to the City of New York Reasonable Accommodation Appeals Panel ("Citywide Panel").

40. The Order stated in pertinent part: "Nothing in this Order shall be construed to prohibit any reasonable accommodation otherwise required by law."

41. The Vaccine Mandate provided for reasonable accommodations on its face pursuant to section eight of the Order of the New York City Commissioner of Health and Mental Hygiene.

42. And the Defendant implemented a procedure for accepting religious and medical accommodation requests.

43. The City promulgated a written policy regarding the implementation of the Vaccine Mandate and the reasonable accommodation process.

44. This policy, entitled "FAQ on New York City Employees Vaccine Mandate" provided that "[a] sincerely held religious, moral, or ethical belief may be the basis for a religious accommodation."

45. The policy provided that a request based on a personal, political, or philosophical preference does not qualify for a religious accommodation.

46. This policy also provided that the alternative to vaccination allowed which would not cause an undue hardship if an employee if granted a reasonable accommodation would be submission of a weekly negative test result.

47. This policy also provided for medical accommodations.

48. Temporary medical accommodations were provided for employees within the isolation period after Covid 19 infection and employees within ninety days of antibody treatment.

49. Permanent medical accommodations were provided for employees who were unable to mount an immune response to Covid 19.

50. The policy also provided that employees who requested reasonable accommodation would continue working and submitting weekly negative test results while their accommodation request and appeal was pending.

51. Due to administrative constraints and backlog, as well as concerns over staffing, thousands of City employees, including many DSNY employees were permitted to continue working unvaccinated for many months after the Vaccine Mandate was implemented.

52. Some of these City Workers were never placed on LWOP nor were they ever terminated, and instead continued to submit to a weekly testing until the Vaccine Mandate was eventually lifted. DSNY also promulgated its Policy and Administrative Procedure 2021-03regarding the Vaccine Mandate ("DSNY COVID-19 Policy").

53. The DSNY COVID-19 Policy stated that DSNY employees who were granted reasonable accommodations would have to submit proof of a weekly negative COVID-19 PCR test result.

54. Employees could utilize on-site testing at DSNY locations or seek weekly tests elsewhere.

55. In the event DSNY did not provide or ceased to provide on-site testing at DSNY locations, accommodated employees were eligible for up to three hours per week of excused leave for the purpose of receiving a weekly COVID-19 PCR test.

**Plaintiff's Religious Accommodation Request**

56. Plaintiff was employed full-time by the City of New York and was actively working during the period when requests for reasonable accommodation to the October 20, 2021 Commissioner's Order were due.

57. Despite the Order, Plaintiff was not immediately aware of his right to apply for a religious accommodation.

58. Plaintiff was never advised by his superiors or any agency representative that he had the right to apply for a religious accommodation to the COVID-19 vaccine mandate while working his day shift.

59. Plaintiff only became aware that he was eligible to request a religious accommodation after learning about the process from other sources, not from his supervisors or the agency.

60. Even after learning he could apply for a religious accommodation, Plaintiff was never provided with instructions or guidance from his employer regarding how to initiate or submit such a request.

61. Plaintiff was ultimately forced to search online to determine how to apply for a religious accommodation, and through independent efforts was able to locate the relevant form titled "Affidavit of Vaccine Exemption on Religious Grounds For City Employees."

62. Plaintiff completed the form to the best of his knowledge and ability, without any assistance or direction from the agency.

63. On the form, Plaintiff attested in relevant part: "I, Vincent Maiorino, the undersigned, do hereby swear and affirm that I am a member of a recognized religious organization, and that the immunizations required by DSNY are contrary to my religious tenets and practices. On this basis, as the above referenced immunization requirements violate my right to freely exercise my religious as guaranteed by the First Amendment of the Constitution of the United States of America, I am asserting my rights to an exemption from NYC DSNY immunization requirements."

64. Plaintiff then signed the form in front of a notary.

65. On or about November 4, 2021, Maiorino submitted his formal request to DSNY for a religious accommodation from the COVID-19 vaccine mandate imposed on municipal employees by the City of New York (the "Vaccine Mandate"), citing his sincerely held religious beliefs as the basis for his request by submitting the completed form.

66. Plaintiff's application sufficiently notified DSNY that his sincerely held religious beliefs conflicted with the Vaccine Mandate and requested a reasonable accommodation to the Vaccine Mandate.

67. DSNY did not require individuals to provide any specific information in the initial accommodation request.

68. Ryan David, DSNY's Equal Employment Opportunity ("EEO") Officer, testified at a deposition in *Rizzo v. New York City Dep't of Sanitation*, Case No. 1:23-cv-07190, that some employees provided detailed requests and others only include their name, reference number, and "religious exemption".

69. Mr. David testified that DSNY left it "open-ended" as far as what employees could submit in the initial request.

70. Mr. David testified that if DSNY received a request that only stated, for example, an employee's name, reference number, and the words "religious exemption", without any details or information, that would "trigger follow-up" from the DSNY so that they could send the employee a "request for additional information" so they could have an "understanding" of "why getting the vaccine conflicts with their sincerely held religious beliefs."

71. Mr. David testified that DSNY "created templates for requests for additional information" so that reviewers could request specific additional identification based upon how the DSNY determined that the initial request by the employee was "insufficient".

72. Mr. David testified that the DSNY reviewers who were responsible for sending employees requests for additional information were attorneys from the DSNY's legal department, not from the EEO Office.

**DSNY's Denial**

73. On or about November 20, 2021 DSNY denied Maiorino's initial request for a religious exemption via a pro forma letter entitled: "Denial of Religious Exemption Appeal Information." The denial stated that information "you provided in support of your request has not sufficiently demonstrated to DSNY that there is a basis for granting you an exemption to the above Order, DSNY is denying your request for an accommodation. Because your request for an accommodation was submitted after November 2, 2021 you will be placed in Leave Without Pay Status Wednesday, November 24, 2021 unless you submit proof of receipt of a Covid-19 Vaccine before this date."

74. The denial letter also advised Plaintiff "that you have three (3) business days to appeal this decision which means your appeal must be submitted by no later than Tuesday, November 23, 2021 at 5:00pm.

75. The denial letter further advised "that plaintiff must provide all requested information and documentation to the appeal portal and choose one of two options below for your appeal."

76. Under Option 1, "employees may choose to appeal to a central City panel consisting of DCAS, Law [Department] and the City Commission on Human Rights. Appeals will be decided based on the documentation submitted to DSNY, and there shall be no live hearing…If your appeal is granted by the City panel, you will be permitted to report to work so long as you continue to submit to a weekly negative COVID test."

77. The Plaintiff was required to submit all appeal documentation to DSNY and DSNY then submitted it directly to the Citywide Panel on his behalf.

78. DSNY was required to submit the documentation Plaintiff submitted to DSNY on appeal to the Citywide Panel.

79. The City had an express written agreement with Scheinman Arbitration and Mediation Services ("SAMS") to review appeals submitted by DSNY employees following the denial of religious accommodation requests.

80. In doing so, the City knowingly permitted SAMS to apply evaluative standards and practices that had been stricken and deemed constitutionally infirm in *Kane v. De Blasio*, including but not limited to requiring supporting documentation from clergy, rejecting personal religious beliefs, and rejecting requests based on the applicant's denominational affiliation or the public stance of religious leadership.

81. By endorsing and deferring to SAMS's use of these unlawful criteria, the City failed to ensure individualized, lawful review of its employees' religious accommodation appeals, in violation of federal, state, and local law.

82. Option 2 offered an alternative: as an alternative to submitting your appeal to the City panel, employees may choose to appeal to SAMS, subject to the terms set forth below:

a. Employees shall be required to affirmatively waive their individual rights to seek an accommodation through any other legal means or process or to bring a legal challenge to the process or the denial of an accommodation request, except the employee may bring an Article 75 appeal.

b. SAMS will only grant appeals based on religious exemptions if it is in writing by a religious official (e.g., clergy). Requests shall be denied where the leader of the religious organization has spoken publicly in favor of the vaccine, where the documentation is readily available (e.g., from an online source), or where the objection is personal political, or philosophical in nature. Exemption requests shall be considered for recognized and established religious organizations (e.g. Christian Scientists).

c. A panel of arbitrators identified by SAMS shall hear these appeals and may request the employee of DSNY submit additional documentation. The assigned arbitrator may also request information from City doctors as part of the review of the appeal documentation. The assigned arbitrator, at his/her discretion, will either issue a decision on the appeal based on the documents submitted or hold an expedited (virtual) factual hearing. If the panel requests a factual hearing, the employer may elect to have a union representative present but neither party shall be required to be

represented by an attorney at the hearing. The City will be represented at the hearing by attorneys from the Office of Labor Relations and/or the **NYC Law Department**. The expedited hearing shall consist of brief opening statements, questions from the arbitrator, and brief closing statements. Cross examination shall not be permitted. Any documentation submitted at the Arbitrator's request must be provided to DSNY at least one business day before the hearing or the issuance of the written decision without hearing.

83. Under Option 2, if the appeal was granted by the arbitrators, the employee is permitted to report to work so long as you continue to submit to a weekly negative Covid test.

84. This was a boilerplate denial which all DSNY employees who were denied religious accommodation received.

85. It was the City's policy to reject accommodation requests from Roman Catholics on the basis that the Pope, as the leader of the Catholic Church, had publicly endorsed the COVID-19 vaccine.

86. In fact, under the City's so-called "Option 2" review process, applicants who identified as Roman Catholic were required to be categorically denied religious accommodations on the basis that the leader of their faith, Pope Francis, had publicly expressed support for the COVID-19 vaccine.

87. Rather than conducting an individualized assessment of the sincerity of each applicant's religious beliefs, Defendant and its reviewing entities relied on the generalized position of the Catholic Church's leadership to summarily reject requests from Catholic employees, including Plaintiff. Under Option 2, the New York City Law Department—the same entity responsible for deciding appeals to the Citywide Panel under Option 1 (as well as

advising City agencies on the initial agency determination)—actively defended the practice of denying Catholic applicants by asserting that it was an acceptable and lawful policy for agencies to reject accommodation requests solely because of the Pope's pro-vaccine statements. In doing so, the Law Department endorsed a policy that failed to meet the legal requirement of individualized consideration and instead permitted categorical denials based on religious affiliation, in violation of federal, state, and local protections for religious exercise.

88. The Defendant's policy and practice effectively disregarded the sincerely held individual religious beliefs of Catholic employees by substituting the generalized public position of the Pope for an individualized assessment, in violation of constitutional and statutory protections requiring a case-by-case evaluation of religious accommodation requests.

89. This approach resulted in the blanket denial of numerous legitimate religious claims, including Plaintiff's, solely because of their denominational affiliation, *to wit*, Catholic.

90. Defendant, including DSNY, also required employees, including Plaintiff, to submit a clergy letter in support of their religious accommodation requests.

91. Under Option 2, the New York City Law Department—the same entity responsible for advising City agencies and deciding appeals by City Workers under Option 1—actively defended the practice of denying Catholic applicants by asserting that it was an acceptable and lawful policy for agencies to reject accommodation requests solely because they did not submit a clergy letter.

92. Plaintiff did not submit a clergy letter in support of his request.

93. DSNY stated in its denial letter that the information Plaintiff provided was insufficient to establish a basis for granting a religious exemption.

94. This determination was made without any individualized assessment.

95. Plaintiff explicitly notified DSNY that he was "a member of a recognized religious organization, and that the immunizations required by DSNY are contrary to my religious tenets and practices" in his initial November 4, 2021 communication with DSNY.

96. This statement was sufficient to place the agency on notice of a religious conflict and required DSNY to seek clarification rather than deny the request outright.

97. And DSNY was aware that this was sufficient notice.

98. On September 9, 2021, the City held a training for the City's agencies' EEO Officers, including DSNY, which instructed that the Equal Employment Opportunity Commission ("EEOC") guidance cautioned that an employer should generally assume that an employee's request for a religious accommodation is based on a sincerely held religious belief, and that "[w]hen the accommodation request itself does not provide enough information to make a determination, and the employer had doubt as to the basis of the accommodation request, the EEO Officer is entitled to make a limited inquiry" in order to "identify a specific religious belief, observance, or practice that conflicts" with the Vaccine Mandate.

99. Despite being aware of this EEOC guidance, DSNY simply denied Plaintiff without inquiring as to the nature of the religious conflict with the Vaccine Mandate.

100. According to deposition testimony by Ryan David, DSNY's head EEO Officer, DSNY reviewers were supposed to send employees who did not submit sufficient information to make a determination a "Request for Additional Information." This did not happen with Plaintiff.

101. On October 29, 2021, DSNY sent an email to its own accommodation reviewers that provided an email template "that should be helpful when requesting additional information from employees who have requested a religious exemption from the City's vaccine mandate."

102. This email stated: "The third bullet can be used when additional information is needed for you to determinae how the mandate conflicts with a sincerely held belief. The final bullet should be used when employees have not provided sufficient information about how their objections are religious in nature."

103. That same day, DSNY sent guidance to its reviewers requiring: "If an employee has not provided sufficient information for you to make a decision (e.g., the request contains minimal or incomplete information; the request does not explain how the mandate would conflict a sincerely held religious belief; the request is a form affidavit), you must senf an email to the employee requesting additional information."

104. DSNY was aware that an employee's initial request for religious accommodation does not need to contain detailed theological explanations.

105. DSNY knew that the law requires only that an employee give notice that a conflict exists between a work requirement and a sincerely held religious belief.

106. Plaintiff did so in his November 4, 2021 email.

107. DSNY was obligated to initiate an interactive process to understand the nature of the Plaintiff's religious conflict and explore possible accommodations.

108. The September 9, 2021 City training and the DSNY's own October 29, 2021 accommodation guidance explicitly instructed DSNY accommodation request reviewers that an employee's statement of a religious conflict with a policy is sufficient to trigger the agency's duty to engage in follow-up dialogue if clarification is needed.

109. Despite this clear guidance, DSNY chose to treat Plaintiff's initial request as "insufficient" and to deny it outright, rather than fulfilling its obligation to seek clarification or to conduct any dialogue.

110. In doing so, DSNY applied a standard far stricter than what the Human Rights Laws, and City policy require, effectively shifting its own responsibility to follow up onto the employee and defeating the purpose of the accommodation process.

111. DSNY's denial therefore was not based on a lack of information from Plaintiff but on its own failure to communicate with the Plaintiff.

112. DSNY did not request any additional information from Plaintiff.

113. DSNY did not communicate with Maiorino regarding his request for religious accommodation before issuing the denial.

114. DSNY did not find Plaintiff's religious beliefs to be insincere.

115. DSNY did not ask Plaintiff any questions about the sincerity of his religious beliefs.

116. The DSNY unilaterally deemed further information could not change the outcome Plaintiff's accommodation request and thus denied his request without any communication.

117. The denial plaintiff received was a boilerplate letter sent to all other DSNY employees who were also denied religious accommodations.

118. The DSNY had attorneys from their general law unit reviewing reasonable accommodation requests to Vaccine Mandate.

119. Those attorneys did not have experience deciding reasonable accommodations and did not work in the DSNY Office of Equity Diversity and Inclusion ("OEDI").

120. These attorneys did not decide reasonable accommodations as part of their job duties.

121. The DSNY failed to consider less restrictive measures that would stem the spread of COVID-19.

122. The DSNY considered only weekly PCR Testing as sole potential accommodation for Plaintiff.

123. The DSNY did not try to accommodate Plaintiff in any other way.

124. The DSNY did not explore any other options.

125. The DSNY then ruled out weekly PCR testing without reason, despite granting this same accommodation to other similarly situated employees.

**Appeal to the Citywide Panel:**

126. The City formed the Citywide Panel in order to adjudicate appeal of reasonable accommodations requests to the vaccine mandate that were denied at the agency level.

127. The Citywide Panel functioned as an appeals body.

128. The Citywide Panel is made up of three voting members who handled the denials of religious accommodation appeals.

129. The Citywide Panel consisted of a panel of three decision makers, one from Law Department, one from Citywide Administrative Services ("DCAS") and one from the Commissioner of Human Rights.

130. A final disposition on an appeal required votes from all three members with a 2-1 majority prevailing in the event of a disagreement.

131. Plaintiff timely appealed choosing option 1, appealing to the Citywide Panel.

132. Employees with access to a City portal could submit their appeals directly through this portal and it would be received by the Citywide Panel.

133. The portal stated: "The agency will provide all records you previously provided to them. You may also submit additional documentation in support of your appeal through this portal."

134. The portal would notify the agency if an employee filed an appeal through the portal and the agency Equal Employment Opportunity ("EEO") officer would then be responsible for uploading documentation received and the reason for the agency denial to the portal for the Citywide Panel to review.

135. Employees without access to the City portal were required to file their appeal directly through their agency's EEO or Human Resources office.

136. The City notified all agencies, including DSNY, that the agency was required to upload all relevant documentation to the Citywide Panel for review.

137. This included documents submitted by the employee on appeal.

138. Specifically, the City's guidance to agencies stated: "All documents submitted for the case, including those submitted to the agency by the employee after the agency determination, must be uploaded."

139. It was the City's established policy and practice to allow employees whose religious accommodation requests were denied by their agencies to appeal to the Citywide Panel. On appeal, employees were expressly permitted to submit additional documentation in support of their requests.

140. The Citywide Panel reviewed both (1) the original materials submitted to the agency and (2) any additional documentation submitted on appeal. The Panel then made its determination based on the complete record, which included both sets of materials.

141. Eric Eichenholtz, a member of the Citywide Panel, confirmed this practice in deposition testimony in another case involving a DSNY employee denied a religious accommodation. He testified that the Panel reviewed the employee's appeal statement and made its determination based on *all* documentation submitted, both at the agency level and

on appeal. (Rizzo v. City of New York, Eichenholtz Dep. 35:14–22, 37:23–38:15, 39:23–40:7.)

142. On November 19, 2021, while still actively working his full-time shifts, Maiorino chose option 1 and timely submitted an administrative appeal of the denial directly to DSNY's EEO Office, in accordance with procedures established by the City of New York.

143. Specifically, Plaintiff submitted an email directly to the email address that DSNY's EEO Office designated for Vaccine Mandate accommodation requests, that stated:

> To Whom it May Concern: My name is Vincent Maiorino, reference number xxx2422, phone is xxx-xxx-xxxx, email is vmaiorino@xxxxxx.xxx. XXX is my Union, Option 1. I am appealing the denial of my religious exemption due to my sincere, deeply held religious beliefs. The Roman Catholic Church teaches a person may be required to refuse a medical intervention, including a vaccination, if his or her informed conscience comes to this sure judgment. While the Catholic Church does not prohibit the use of vaccines in principle, her teachings provide a principled religious basis on which a Catholic may determine that he or she ought to refuse certain vaccines. The Church holds that vaccination is not morally obligatory in principle and so must always be voluntary. Moreover, there is a general moral duty to refuse the use of medical products, including certain vaccines, that are the produced using human cell lines derived from direct abortions. It is permissible to use such vaccines only under certain case-specific conditions, based on a judgment of conscience. An individual's judgement in these matters is to be respected because he/she is morally required to obey the judgment of a sure conscience, even if it is objectively in error. As the Catechism makes clear, a person "must not be forced to act contrary to his conscience. Nor must he be prevented from acting according to his conscience, especially in religious matters" I thank you for respectfully adhering to my first amendment rights guaranteed as a citizen of the United States of America by our great Constitution and reinforced on a state level by the Fourteenth Amendment without prejudice. Vincent Maiorino.

144. This email informed DSNY that Plaintiff is a Catholic and that he was refusing the COVID-19 vaccine based on his sincerely held religious belief opposing the use of vaccines developed or produced using human cell lines derived from abortion.

145. DSNY was required by the City to submit this documentation to the Citywide Panel.

146. The Citywide Panel received Plaintiff's appeal statement and on November 19, 2021, the Citywide Panel e-mailed Plaintiff to inform him that his appeal was under review.

147. Despite his timely appeal, and without a final decision on his appeal pending before the Citywide Panel, Maiorino was placed on LWOP on or about November 28, 2021.

148. On December 21, 2021, Plaintiff's attorney submitted an appellate brief to DSNY's EEO Office (through their e-mail address designated for Vaccine Mandate appeals) in support of Plaintiff's appeal.

149. As an exhibit to this brief, Plaintiff's attorney included a comprehensive written statement from Plaintiff further articulating the nature and basis of his sincerely held religious beliefs and how they directly conflicted with compliance with the Vaccine Mandate.

150. In his supplemental appeal submission, Maiorino described in detail his devout Roman Catholic upbringing and the religious sacraments he received throughout his life, including Baptism, Communion, Penance, Confirmation, and Matrimony.

151. Maiorino explained that his Catholic faith teaches that the human body is a temple of God, and that as a believer he is called to maintain the purity, sanctity, and holiness of his body, including abstaining from substances that may defile it.

152. He cited specific Scripture passages supporting his belief that injecting vaccines, which he asserts contain or were developed using unclean substances—including, in his view, fetal cell lines derived from abortions—is a direct violation of God's commandments and the sanctity of life, both of which are core tenets of his faith.Maiorino also expressed a deeply held pro-life religious belief that life begins at conception, and that abortion constitutes murder in violation of the Sixth Commandment. He further expressed that participating in or benefiting

from any product derived from abortion, including certain COVID-19 vaccines, would violate his conscience and religious convictions.

153. Maiorino emphasized that his refusal to receive the COVID-19 vaccine was not based on political or philosophical views, but rather on a sincere and personal religious obligation to obey God's commandments, maintain the sanctity of his body and blood, and abstain from participating in what he views as the moral wrong of abortion.

154. His supplemental letter states:

> My genuine and sincere Roman Catholic religious beliefs are grounded in my life experiences and in the Scripture. I was raised in a devout Catholic home and as a young child received my holy sacraments of Baptism, Communion, Penance, Confirmation and Matrimony is the Roman Catholic Church. As a Catholic, I believe that in order to walk the path to salvation and make it back to Heaven, I must have a personal relationship with God. I believe in order to have that personal relationship with God, I must know His Word and obey His commandments.
> As I researched and investigated vaccines with a new perspective, one through the lens of the word of God, I realized that they conflict with the tenets of my faith.
> **<u>VACCINES ARE UNHOLY</u>**
> One of the basic tenets we learn as a Catholic is that the body is a temple of God. With that revelation, it becomes a duty to avoid things that would cause it harm or injury. "*Do you not know that your body is a temple of the Holy Spirit who is in you, whom you have received from God*?" (Corinthian 6:19)
> The Scripture challenges us to honor the gift of our bodies as a temple of the Holy Spirit. *"For it seemed good to the Holy Spirit, and to us, to lay upon you no greater burden than these necessary things: that you abstain from things offered to idols, from blood, from things strangled, and from sexual immorality. If you keep yourselves from these, you will do well. Farewell."* (Acts 15:20) *"But that we write to them to abstain from things polluted by idols, from sexual immorality, from things strangled, and from blood." (*Acts 15:28- 29)
> The Scripture is very clear that my body is a temple of God and that my likeness is made in God's image. (Genesis 1:27; 1Corinthians 3:16-17, 2 Corinthians 6:19-20). Specifically, Corinthians 3:17 state that "*If anyone destroys God's temple, God will destroy him. For Gods temple is holy and you are that temple*." I believe that the Scripture tells me to remain holy, to be free from blemish, to keep my temple holy and pleasing to Him and that this is my duty to do so. (Peter 1:15-16; Leviticus 11:44-45; Ephesians 5:27; Romans 12:1 and 1Corinthians 3:16-17).
> As a Catholic, these verses from the Bible speak to me in several profound ways. I believe that my body is the temple of God and God commands that I treat my body as such.

I also believe this to mean that I must protect myself from as many abominable things in my life as possible. I believe that God's law mandates that I, as a believer, must keep my temple clean and pure and free from toxins and that this is my duty as His follower.

I believe that I must preserve the sanctity of my blood. This includes abstaining from injecting vaccinations into my body, as the vaccines are unclean and impure according to God's word. By putting them in my body, I will be tainting my blood in direct violation of my duty to be holy. In other words, the Scripture compels me to choose foods, medicines and activities that preserve and promote my life and keeps me holy and pure. Catholic teachings share the lesson that our blood, as the very essence of our souls, is sacred. Because the life of every creature begins with its blood. Leviticus 17:14 "For the life of every creature1 is its blood: its blood is its life. Therefore I have said to the people of Israel, You shall not eat the blood of any creature, for the life of every creature is its blood. Whoever eats it shall be cut off.

The unclean ingredients of vaccines are listed on the Center for Control Disease's website. The website contains vaccine inserts which list the ingredients found in each vaccine. According to the CDC website, vaccines have been manufactured, produced and contain fetal cell lines from aborted babies, neurotoxins, hazardous substances, attenuated viruses, animal cells, foreign DNA, albumin from human blood, carcinogens and chemical wastes.

I believe that consuming any of these ingredients is in strict violation of my duty to treat my body as a holy temple of the very Spirit of God. I also believe that consuming any of these ingredients violates and defiles the sanctity of my blood in direct contradiction to my personal religious beliefs.

I also believe that the ingredients found in vaccines are not from God but from man and are not clean. Therefore, consuming them is in in direct contradiction to my religious beliefs to keep my temple holy, clean and pure. I also believe that the Scripture is clear in its warning not to consume unclean things and warns me that a violation of this duty has severe consequences.

I believe that if I defile my temple, I will be destroyed. (1Corinthians 3:16-17; Deuteronomy Chapter 14; Leviticus Chapter 11). As a believer, I believe that being destroyed means that I will leave the path of salvation and be condemned to Hell. Therefore, I must abstain from vaccines because I believe that God's law mandates that I, as a believer, must keep my temple clean and pure and free from toxins. I believe that this is my duty as a believer. The ingredients found in vaccines are comprised of foreign particles that are unclean and impure. By putting them in my body, I will be defiling the sanctity of my blood and tainting my blood in direct violation of my duty to be holy and in direct contradiction to my religious beliefs.

**Abortion is violation of God's Sixth Commandment: Thou shall not kill. (Ephesians 20:13).**

"Thou shall not murder" is the sixth Commandment (Exodus 20:13). James 1:25 and James 2:10-12 inform us that the Ten Commandments are the perfect law of liberty that we will be judged by. My religious beliefs are pro-life.

I believe abortion is murder and I believe life begins in the womb at conception. The most horrifying discovery I made was that the vaccines not only contain impure additives that the Scripture teaches me I must avoid, but the vaccines are also produced, manufactured and contain the fetal cell lines from aborted babies. I believe the Bible teaches the sanctity of innocent human life, from conception, pre-birth, to birth, to natural or accidental death. I often look to the Bible when I've been in need of help with such pride, fear, and deceit. I feel in my conscience, as led by the Holy Spirit, that I cannot participate in or benefit from abortion, which is murder according to the Bible. Acts 21:25 "As for the Gentile believers, we have written to them our decision that they should abstain from food sacrificed to idols, from blood, from the meat of strangled animals and from sexual immorality."

I believe that all humans born and unborn are made in the image of God. Ephesians 1:3-4 "Blessed be the God and Father of our Lord Jesus Christ, who has blessed us in Christ with every spiritual blessing in the heavenly places, even as he chose us in him before the foundation of the world, that we should be holy and blameless before him." I can never reconcile consuming a product that contains the life line of babies who were murdered in the womb. I can never reconcile using a product from a company that uses and profits from the murder of another human being.

The covid vaccination also has used fetal cell lines in their making. Johnson & Johnson (Janssen Pharmaceuticals) COVID shot "did require the use of fetal cell cultures, specifically PER.C6, in order to produce and manufacture the vaccine." Multiple state department of health "FAQs" confirm that while mRNA vaccines by Pfizer-BioNTech and Moderna do not "contain" fetal cells, but clearly state that "[e]arly in development of mRNA vaccine technology, fetal cells were used for 'proof of concept' (to demonstrate how a cell could take up mRNA and produce the SARS-CoV-2 spike protein) or to characterize the SARS-CoV-2 spike protein." Thus, both Pfizer and Moderna used abortion-derived cell lines to "to test the efficacy of both vaccines." Therefore, claims that Pfizer and Moderna "do not require the use of any fetal cell cultures in order to manufacture (produce) the vaccine" are in conflict with the statement that "such a cell line was used to test the efficacy of both vaccines." "Testing the efficacy" is certainly a part of the research and development process. Thus, it is my moral duty from God, to abstain from vaccines.

I believe that if I knowingly fail to obey this duty, I will knowingly sin and violate my commitment to God and face His judgment.

My conscience is the moral compass by which God speaks to me and guides me in making my decisions in life. It is the vehicle for which God speaks to me. I cannot undo my prior acts of consuming these vaccines. I can and have, asked God to forgive me and promised Him to sin no more. The bible is clear that true repentance involves sorrow for acts of sin and a fundamental change in attitude. (Romans 3:23; 1 John1:8).

I hold sincere pro-life religious beliefs that prohibit me from participating in or benefiting from an abortion no matter how remote in time that abortion occurred. Now that I have discovered about the fetal cell lines used, I am able to make

these decisions for myself. The Lord's Divine intervention, giving me the knowledge that vaccinations didn't feel right in the name of God. I now know and share knowledge with God by accepting Jesus Christ as my Lord and my Savior and applying His rules and making my own decisions based upon His word of God. I know deep in my heart and soul that God is prohibits me from consuming vaccinations and I will abstain from them in Jesus' name.

Consuming a vaccine that has been made from the degradation of the sanctity of another life goes against my personal religious beliefs and my conscience. I believe the Scripture is very clear that blood is life including the blood of an unborn baby and I must not consume it in any way. Deuteronomy 12:23-25 "But be sure you do not eat the blood, because the blood is the life, and you must not eat the life with the meat. You must not eat the blood; pour it out on the ground like water. Do not eat it, so that it may go well with you and your children after you, because you will be doing what is right in the eyes of the Lord." I believe that I must not consume vaccines. Genesis 9:4 "But you must not eat meat that has its lifeblood still in it. I also do not believe that man can sacrifice one life the good of many. I believe that each life is a child of God and must be respected and sanctified. Matthew 18:12-14 "What do you think? If a man owns a hundred sheep, and one of them wanders away, will he not leave the ninety-nine on the hills and go to look for the one that wandered off? And if he finds it, truly I tell you, he is happier about that one sheep than about the ninety-nine that did not wander off. In the same way your Father in heaven is not willing that any of these little ones should perish."Leviticus 17:10-14 "'I will set my face against any Israelite or any foreigner residing among them who eats blood, and I will cut them off from the people. For the life of a creature is in the blood, and I have given it to you to make atonement for yourselves on the altar; it is the blood that makes atonement for one's life.[a] Therefore I say to the Israelites, "None of you may eat blood, nor may any foreigner residing among you eat blood." "Any Israelite or any foreigner residing among you who hunts any animal or bird that may be eaten must drain out the blood and cover it with earth, because the life of every creature is its blood. That is why I have said to the Israelites, "You must not eat the blood of any creature, because the life of every creature is its blood; anyone who eats it must be cut off."

As a Catholic, I support life and choose to keep God's Commandments. In the Scripture, Jesus said, "If you wish to enter life, keep the commandments" (Matthew 19:17), and "You will live in my love if you keep my commandments" (John 15:10). St. John emphasized, "The man who claims, 'I have known him,' without keeping his commandments is a liar; in such a one there is no truth."

I believe that conscience does not establish the law, but conforms to and applies God's law to actions. My conscience tells me to abstain from any and all vaccines because by doing so I will be preserving the sanctity of life. Unfortunately, vaccines contain fetal cell lines either in them directly or the vaccine manufacturer at some point, used fetal cell lines during the production and manufacturing of the vaccine including the newer Covid vaccine.

I believe that if I consume these vaccines I am violating God's order in three ways:

By participating in the actual murder of a human being.
I am complicit in the heinous business of trafficking and marketing the remains of aborted children, and
I am disregarding the way that God made me. *The First letter of the Corinthians 2:5 states that "so that your faith might rest not on human wisdom but on the power of God".* Not only are immunizations man made, but the act of immunizing taints the blood and body (God's temple). This sends a false message that what God has made cannot heal and is flawed, and needs man to protect and heal based on *Romans 12:2 "Do not be conformed to this world, but be transformed by the renewing of your minds, so that you may discern what is the will of God – what is good, and acceptable and perfect."*
It is my sincere and genuine belief that Immunizations betray a lack of faith in God. The teachings of the Bible state that optimal health can be achieved only if you have complete faith in God.
As a Catholic, It is my personal religious belief that I can't put myself in a position where I put my trust in man and not my God. *James 1:6-8 "But let him ask in faith, with no doubting, for he who doubts is like a wave of the sea driven and tossed by the wind. For let not that man suppose that he will receive anything from the Lord; he is a double-minded man, unstable in all his ways."*
*I believe* God tells me that he created my body perfectly in his image. *Genesis 1:27 "So God created humankind in his image, in the image of God he created them, male and female, he created them."* Glorifying immunizations is like glorifying a false idol *Psalm 31:6 "I have hated those who regard useless idols; But I trust in the Lord.*
My pro-life religious beliefs tell me that using an aborted baby to produce or manufacture vaccines is a grave moral evil that I must avoid at all costs. I believe that I cannot support any company that uses them to produce a product for profit. When I was growing up, Pope John Paul II was the pope of the Roman Catholic Church. He was a strong advocate for the unborn. Pope John Paul II said that: "The inviolability of the person which is a reflection of the absolute inviolability of God, finds its primary and fundamental expression in the inviolability of human life. Above all the common outcry which is justly made on behalf of human rights – for example, the right to health, to home, to work, to family, to culture – is false and illusory if the right to life, the most basic and fundamental right and the condition for all other personal rights, is not defended with maximum determination" (Christifedeles Laici, 38).
I believe that using vaccines made from the cells of murdered unborn children contradicts a "maximum determination" to defend unborn life. I believe that if I knowingly and voluntarily receive such vaccines I am complicit with the murder of unborn babies and give ungodly support to the abortion industry. I believe that abortion is the most egregious vile crime against God and I cannot accept it under any circumstance. I believe that if I take a vaccine I am knowingly trying to benefit from the loss of sanctity of life of the unborn child.
I believe that this is a serious violation of God's Sixth commandment to thou shall not kill. Thus, my religious beliefs and my conscience forbid me from consuming and injecting any vaccine that contains fetal cell lines.

**DUTY TO FOLLOW CONSCIENCE**

The Catholic Church has, over the centuries, extensively addressed issues related to bodily integrity generally and vaccination specifically, including issues of voluntariness and vaccine mandates.

One of the strong teachings of the Catholic Church is to use and follow your conscience even if it errs.

As a Catholic, I believe that my moral conscience guides me to do the right thing. One of the religious beliefs of Catholicism is set out in the Catechism: that I must always obey the "certain judgment of my conscience." This means that if there is something that my conscience tells me is wrong, and I were to deliberately act against my conscience, then I would be condemned, even if my conscience errs.

My conscience has come to a sure judgment to refuse vaccines especially the Covid 19 vaccine. I genuinely believe, that since my conscience tells me to refuse them, then I am required by God to refuse them. Therefore, since my conscience comes to the "sure judgment" not to get the shot then I cannot and must not get it in accordance with my religious belief.

**MEDICAL DECISIONS MUST BE VOLUNTARY**

The Catholic Church has been also very clear that getting a vaccination or any medical procedure, is not a moral obligation and the decision to do so must be voluntary.

I genuinely and sincerely believe that my decision to refuse vaccinations must be voluntary and not forced upon me by my employer or any other military or public authority.

I also genuinely believe, that my decision to refuse a vaccination must also be in accordance with my conscience which tells me to stand with God and not to take it.

The Catholic Church has been also very clear that getting a vaccination or any medical procedure, is not a moral obligation and the decision to do so must be voluntary. Regarding COVID in particular, [The Congregation for the Doctrine of the Faith (CDF) "Note on the Morality of Using Some Anti-Covid 19 Vaccines, " December 17, 2020 n. 5: stated that "At the same time, practical reason makes evident that vaccination is not as a rule, a moral obligation and that , therefore it must be voluntary."]

https://www.vatican.va/roman_curia/congregations/cfaith/documents/rc_con_cfaith_doc_20201221_nota-vaccini-anticovid_en.html The Congregation states that: COVID-19 vaccines that used cell lines originating from aborted fetuses are morally compromised. [Note: The J&J vaccine "is an adenoviral vector grown in the PER.C6 cell line that originated from a healthy 18-week-old aborted child."]

https://www.usccb.org/moral-considerations-covid-vaccines

The Pfizer and Moderna vaccines were tested using the "morally compromised HEK-293 cell line," originating from "a child aborted in the Netherlands in 1972."] https://www.usccb.org/moral-considerations-covid-vaccines

As a Catholic, I have a moral duty to avoid use of such vaccines.

However, this moral duty "is not obligatory if there is a grave danger, such as the otherwise uncontainable spread" of COVID-19.

"In the absence of other means to stop or even prevent the epidemic, the common good may recommend vaccination."
"In such a case, all vaccinations recognized as clinically safe and effective can be used in good conscience."
"At the same time, practical reason makes evident that vaccination is not, as a rule, a moral obligation and that, therefore, it must be voluntary."
"Those who, […] for reasons of conscience, refuse vaccines produced with cell lines from aborted fetuses, must do their utmost to avoid, by other prophylactic means and appropriate behavior, becoming vehicles for the transmission of the infectious agent."
Thus, I believe that the moral duty to avoid use of these three COVID vaccines is not obligatory and the choice to receive a vaccine must be voluntary.
I believe that mandates are in violation of Scripture and God's law because it takes the obligatory choice from God's creation. Based upon my religious beliefs I should be exempted from the mandate.
No believer can—in good moral conscience—participate in an immoral abomination which destroys human life. "*Anyone, then, who knows the good he ought to do and doesn't do it, sins.*" (James 4:17). I believe vaccinations contain foreign substances that I genuinely believe defile my body and can jeopardize everlasting life in heaven with my creator, my Father.
I choose to live with God in eternity by following His ways on earth. In order for me to do this, I must obey God's commands and follow my conscience by refraining from man-made vaccines. As a faithful Catholic, I am exercising my right and free will to follow my moral compass. At the end of the day, I am held accountable for my decisions and actions. At the end of my life, my maker will judge how I lived.
*Romans 14:14 Welcome those who are weak in faith, but not for the purpose of quarreling over opinions. Some believe in eating anything, while the weak only eat vegetables. Those who eat must not despise those who abstain, and those who abstain must not pass judgment on those who eat; For God has welcomed them. Who are you to pass judgment on servants of another? It is before their own lord that they stand or fall. And they will be upheld, for the Lord is able to make them stand…For we will all stand before the judgment seat of God."*
I sincerely and genuinely believe I have a religious duty to abstain from them, and request a religious exemption.

155. DSNY responded by e-mail to Plaintiff's attorney, stating: "We have received the documents you have provided and have uploaded them to Mr. Maiorino's appeal file on his behalf."

156. DSNY was thus made further aware of Plaintiff's Catholic religious beliefs and how they conflicted with the Vaccine Mandate.

157. The Citywide Panel received and reviewed these appeal documents before deciding on Plaintiff's appeal and was also aware of Plaintiff's Catholic religious beliefs and how they conflicted with the Vaccine Mandate.

**<u>The City's Policies on Reasonable Accommodations to the Vaccine Mandate:</u>**

158. The City implemented standards, policies and procedures for the City agencies, including DSNY, to use while evaluating and deciding requests for religious accommodations to the Vaccine Mandate.

159. The City promulgated these standards, policies and procedures regarding the Vaccine Mandate through DCAS which instructed various city agencies-including DSNY- on their application.

160. DCAS instructed the various city agencies, including the DSNY, on the standards, policies and procedures regarding religious accommodations to the Vaccine Mandate.

161. These standards, policies and procedures as developed and implemented by Defendant functionally disfavored religious applicants whose beliefs did not align with tenets and precepts of the applicant's organized religion.

162. These standards, policies and procedures, for evaluating and deciding religious accommodation requests to the Vaccine Mandate disfavored Catholics, including Plaintiff.

163. Pursuant to Defendant's standards, policies and procedures, any belief that did not conform to the tenets or recognized doctrine of an organized religion was automatically deemed "personal," "philosophical," or "political" in nature-even where the belief was sincerely held and religious in character.

164. Defendant expressly excluded beliefs deemed personal, political, or philosophical from the definition of "religious" and categorically denied accommodations on that basis.

165. Accordingly, Defendant's determined that there was no valid religious basis for a Catholic to refuse the Covid-19 vaccine, citing the Pope's public support for the vaccination and the fact that not all Catholics objected to it.

166. Defendant's standards, policies, and procedures expressly provided that personal, political or philosophical preferences did not qualify as religious beliefs.

167. The Defendant implemented these policies so that idiosyncratic or personal religious beliefs did not qualify as a valid basis for a religious accommodation.

168. Under these policies, a belief was not considered "religious" unless it conformed to the official doctrine of an established organized religion.

169. Under these policies, a religious belief was presumed invalid unless the applicant could demonstrate that either the belief conformed with the official doctrine of a recognized religious institution and if it did not, then it was deemed personal, political, or philosophical imposing an arbitrary test on applicants.

170. As a result, Catholic applicants – such as Plaintiff- who cited conscience based objections to the vaccine rooted in their faith were deemed to be expressing personal preferences, not religious beliefs.

171. Defendant's policies and procedures required that accommodation decisions be based on the publicly expressed views of religious authorities such as the Pope in the case of Catholics- even where those views were not binding on individual believers.

172. As a result, because the Pope publicly supported the COVID-19 vaccine and not all Catholics opposed it, any Catholic applicant citing a religious objection was deemed to be asserting a personal preference rather than a sincere religious belief.

173. It was the policy and practice of the Defendant to deny requests if the applicant's opposition to vaccination was not "required" by his religion, or where other members of the faith did not oppose the vaccine. Accordingly, under the City's policies, Catholics were categorically disqualified from receiving a religious accommodation because their beliefs diverged from the Pope's official position.

174. When deciding accommodation requests, it was the Defendant's policy and procedure to deny applicants based on publicly expressed views of what the Defendant's considered leader of the applicant's faiths.

175. It was the Defendant's policy and procedure to deny applicant's where the Defendant decided that the applicant's opposition was not required by his faith because other members of the faith did not oppose the vaccine.

176. Defendant failed to recognize that sincerely held religious beliefs-even if not mandated or prohibited by the formal teachings of an organized religion-are protected under the Free Exercise Clause, NYSHRL and NYCHRL.

177. Defendant routinely refused to recognize conscience-based objections as religious in nature, treating appeals to conscience as merely general moral or ethical concerns rather than protected expressions of religious belief.

178. Defendant routinely excluded any belief that was idiosyncratic, conscience-based, or divergent from official institutional doctrine.

179. Defendant also failed to recognize conscience based objections, a well-established Catholic doctrine affirming conscience as a religious obligation, as religious in nature.

180. By failing to recognize the well established Catholic doctrine affirming conscience as a religious obligation integral to Catholic belief, the Defendant's policies, practices and

procedures in evaluating religious accommodations, imposed a narrow and unconstitutional definition of religion that excluded core tenets of Catholic theology.

181. In real cases, the Citywide Panel routinely rejected sincerely religious beliefs by deeming them "personal" or "philosophical," even where those beliefs were based on the applicant's religious conscience.

182. For example four plaintiffs in *New Yorkers for Religious Liberty, Inc. v. City of New York, et.al.,* Case 22-1801 Court of Appeals for the Second Circuit, were found sincere in their beliefs, yet their applications were denied because the City and DOE improperly equated individualized religious guidance—particularly where it diverged from institutional orthodoxy—with "personal," "philosophical," or "idiosyncratic" beliefs unworthy of protection:

183. Plaintiff , Michael Kane, a special education teacher with over 14 years of service in the NYC public school system, holds sincerely held religious beliefs grounded in a personal relationship with God, informed by prayer and spiritual teachings from Buddha, Christ, and others. Having overcome addiction by turning away from pharmaceuticals he follows divine guidance from prayer, which led him to renounce pharmaceuticals and vaccines for over 20 years. He believes vaccines are "pollutants" a determination made through prayer, which he uses to discern what constitutes a pollutant to his body. Despite the DOE conceding the sincerity of his beliefs, his request for religious accommodation was denied—first on the basis that his beliefs did not align with Pope Francis, and later by the Citywide Panel who conceded the sincerity of Kane's beliefs, but rejected his claim on the grounds that guidance from prayer allowing personal discretion is not "religious." By characterizing prayer-based guidance as mere "personal choice," the DOE improperly

converted a religious imperative into a non-religious preference, reflecting impermissible religious animus and entanglement. His reliance on prayer was dismissed as a "personal choice," rather than a protected religious obligation.

184. A second plaintiff, Margaret Chu, Margaret Chu, an ENL teacher formerly in East Harlem with 12 years' experience in special education, is a devout Catholic whose opposition to the COVID-19 vaccine is based on her faith-driven objection to abortion and her moral obligation to follow her conscience as informed by Catholic doctrine. Her parish supported her application with a letter affirming her sincerely held religious beliefs. Nevertheless, Defendant dismissed her beliefs because because it contradicted Pope Francis's view, claiming the Pope's opinion was "more likely correct." The Citywide Panel found her beliefs sincere but denied accommodation on the basis that following moral conscience—even if guided by the Holy Spirit—was not "religious in nature." Her individualized understanding of faith was deemed a "personal choice."

185. A third plaintiff, Heather Jo Clark a DOE Central Office employee, is a devout Christian who returned to Christ after a faith-healing experience and has since maintained a deeply spiritual life guided by the Holy Spirit. She objects to vaccines due to guidance from the Holy Spirit and their connection to aborted fetal cell lines. DOE initially denied her on grounds of "undue hardship," even though she worked remotely and did not interact with students. Although she had been working remotely since 2020 and her position did not involve contact with students or require entry into school buildings, she was denied accommodation on the implausible ground of undue hardship and subsequently denied an appeal hearing without explanation. The Citywide Panel acknowledged the sincerity of her beliefs but found them not "religious" and denied her appeal, because her beliefs were based on personal

guidance from the Holy Spirit rather than a denominational dogma which are not "religious" because they allow individual discretion.

186. A fourth plaintiff, Robert Gladding, was also denied because his religious beliefs were deemed personal. Mr. Gladding, a veteran public school teacher of 20 years, was raised by a mother who, having witnessed religious persecution during WWII in Germany, taught him to find God through personal revelation rather than institutional doctrine. Gladding is deeply religious, raised to seek God personally rather than follow institutional dogma. Gladding makes all major life decisions—including his vocation as a teacher and rejection of vaccines—based on guidance received from God through prayer and meditation. He expressed that God had told him unequivocally that receiving the vaccine would be a sin. Despite the Citywide Panel conceding his sincerity, it denied his accommodation on the grounds that his beliefs, rooted in divine guidance, were not religious because they allegedly permitted individual choice. Like the other plaintiffs, Gladding's deeply held religious convictions were unconstitutionally recharacterized as personal or philosophical,

187. In other examples of unrelated Article 78 proceedings, Eric Eichenholtz, the architect of the Citywide Panel, submitted affirmations that affirmed that the applicant was denied for the same reasons.

188. In *Baratta v. New York City Police Department* (Index No. 85223/2022, NYSCEF No. 26) the petitioner objected to the COVID-19 vaccine due to its association with fetal cell lines, asserting this conflicted with her religious beliefs. However, in an affirmation submitted by Eric Eichenholtz, the City denied the request, reasoning that her belief did not constitute part of a comprehensive religious belief system, but rather amounted to a personal, political, or philosophical objection. Citing EEOC guidance, Eichenholtz emphasized in

paragraph 27 that valid religious beliefs must be more than isolated teachings and must be part of an established system of belief.

189. In *Smith v. New York City Fire Department* (Index No. 533033/2022, NYSCEF No. 44), the petitioner, a practicing Christian, objected to the COVID-19 vaccine based on his belief that his body is a sacred temple of God and that introducing the vaccine—particularly one developed or tested with fetal cell lines—would violate his religious convictions. He cited biblical verses and emphasized his family's shared sacred beliefs. Nonetheless, Defendant dismissed the request on grounds similar to those in *Baratta*, concluding that the petitioner did not hold a sincerely held religious belief that precluded vaccination, but rather a personal belief not rooted in a cohesive religious doctrine.

190. In *Banome v. FDNY* (Index No. 159686/2022), the petitioner objected to the COVID-19 vaccine by citing his belief of the power of prayer in healing. However, Defendant rejected the application, asserting that the petitioner beliefs were personal rather than religious in nature.

191. In *Farrell v. New York City Fire Department* (Index No. 532029/2022, NYSCEF No. 42), the petitioner, a Catholic, objected to the COVID-19 vaccine on the basis of its connection to fetal cell lines, aligning his objection with his understanding of Catholic doctrine. Despite this, Defendant denied the request, again reasoning that the belief failed to meet the threshold of a comprehensive religious belief system as defined by EEOC guidance. According to the City, the petitioner's belief was seen as an isolated moral position rather than a doctrinally required tenet of the Catholic faith, rendering it a personal rather than religious belief for purposes of accommodation.

192. In *DePaola v. New York City Fire Department* (Index No.: 85265/2022, NYSCEF No. 38), the petitioner asserted that he is a devout Christian and that a fundamental tenet of his faith is the obligation to refuse medical interventions, including vaccinations, when his informed conscience concludes that such actions are morally impermissible. He contended that the Christian doctrine allows adherents to follow the guidance of conscience in moral decision-making, particularly where issues of bodily integrity and divine will are involved. Nevertheless, Eichenholtz denied the petitioner's request for accommodation, reasoning that the belief was personal rather than religious. The objection was deemed not to arise from a formal or comprehensive religious doctrine, but instead from a subjective and individual interpretation, rendering it insufficient under the City's criteria for religious exemption

**Fetal cell lines:**

193. It was also the Defendant's policy and procedure to deny applicants who opposed the Covid-19 vaccine based on an opposition to abortion.

194. Defendant's accommodation standards, procedures, and policies provided that applicants, including Plaintiff, who objected to the Covid-19 vaccination based upon a religious objection to abortion should be denied.

195. Specifically, DCAS memorandum dated October 27, 2021 was circulated regarding fetal cell lines when evaluating a religious accommodation request.

196. Specifically, the memorandum cites, among other things, that "in a December 11, 2020, statement, the U.S. Conferences of Catholic Bishops said, "In view of the gravity of the current pandemic and the lack of availability of alternative vaccines, the reasons to accept the new Covid-19 vaccines from Pfizer and Moderna are sufficiently serious to justify their use, despite their remote connection to morally compromised cell lines. The Bishops said that

a vaccine using adenovirus grown in fetal cell lines should be avoided if there are alternatives available; but if one does not have a choice of vaccine without a lengthy delay in immunization it would be permissible to accept it. The bishops further noted that taking the vaccine is "an act of charity toward the other members of our community." They encouraged Catholics to request uncompromised vaccines as they become available. (OHA)

197. The memorandum also cites that "according to the Vatican City State, "when ethically irreproachable Covid-19 vaccines are not available…it is morally acceptable to receive covid-19 vaccines that have used cell lines from aborted fetuses in their research and production process."

198. The October 27, 2021 the DCAS memorandum then concludes and instructs that "after analyzing all nine sources of information in this memo, I feel as though this research and guidance can positively conclude that all three vaccines (Pfizer, Moderna, and Johnson & Johnson) are morally and ethically just from a religious standpoint on fetal cell usage."

199. In email from DCAS's office of Citywide Equity and Inclusion, dated October 28, 2021, DCAS instructed agencies to deny a reasonable accommodation request based on abortion because DCAS claimed that such objections were not based on factual information.

200. The Citywide Panel, which was responsible for reviewing religious exemption requests to the COVID-19 vaccine mandate, went beyond its lawful role of evaluating whether an applicant *sincerely held* their beliefs by rejecting religious objections with scientific counterarguments, rather than assessing whether the belief was sincerely held by the applicant.

201. The Citywide Panel rejected religious accommodations request simply because they believes the religious opposition to aborted fetal cell lines used in creating the COVID-19 vaccines is *factually incorrect* which they are prohibited to do.

202. For example, in another email dated November 3, 2021, addressed to "DCAS team", from a City agency EEO Officer, asks DCAS for clarification on the Law [Department]'s instruction whereby they claim fetal cell lines were not used to develop Covid-19 vaccines nor does it contain aborted fetuses: "DCAS Team, Can you please point me to the statute policy or other reference that addresses the proof that fetal cells were not used to develop the Covid-19 vaccine nor does it contain aborted fetuses? This was referenced by Law in recent calls you've hosted but I don't see where to find the policy/determination that can be used for citing. I'd like to include language in my communications with employees who have noted this as part of their basis for exemption form the mandate."

203. DCAS and the Law Department were instructing agencies to reject religious objections based on a religious opposition to abortion, claiming that aborted fetal cell lines were not used to develop the COVID-19 vaccines.

204. Besides being patently false, this is also constitutionally impermissible, because the City (through its agencies and the Citywide Panel) were rejecting religious beliefs based on the verity of those beliefs.

205. The Defendant's employees charged with reviewing and deciding requests for religious accommodations had total discretion over whether to grant those requests.

206. Sometimes these decision makers strictly adhered to the standards, policies and procedures.

207. Defendant refused to accommodate Plaintiff's religious beliefs because his objections to the COVID-19 vaccination was based upon that the vaccination was created and developed using aborted fetal cell lines.

208. Defendant's policy was to deny requests for accommodations based upon objections based on the applicant's belief that the vaccines were created using aborted fetal cell lines because Defendant considered these beliefs to be "inaccurate".

209. The City instructed its agencies, including the DSNY, to deny requests for religious accommodations that were made based on religious objections to abortion.

210. Defendant unlawfully considered the verity and accuracy of Plaintiff's religious beliefs and denied him because they disagreed with him.

211. The Law Department also instructed the Citywide Panel that religious objections based on an objection to the development of the covid vaccine using aborted fetal cell lines did not constitute a sincerely held religious belief.

212. In an email between a Citywide Panel member and the Law Department, one member asks for clarification as to when he can actually grant a religious accommodation, since he is "mostly seeing folks expressing their view that all Covid vaccinations contain or were tested using fetal stem cells and some personal statements saying I've never taken vaccines ever or not since I became an adult. My understanding from our conversation is that those [fetal cell lines] would <u>not</u> constitute sincerely held religious beliefs, what then what would?"

213. Defendant also refused to accommodate Plaintiff's religious beliefs because he identified as a Catholic.

214. The City categorically denied religious accommodation requests from individuals identifying as Catholics, presuming that their objections were invalid if their religious leaders did not officially oppose the vaccine.

215. The City evaluated the validity of applicant's religious objections by determining whether their beliefs aligned with official doctrine from their religious institutions, effectively choosing which interpretation of religious doctrine to recognize.

216. The Defendant concluded that because the Pope permits Catholics to receive the vaccine plaintiff could not sincerely hold a religious belief opposing vaccination.

217. The Defendant's policies provided that Catholics could not "qualify as a religious belief" because the rejection of the COVID-19 vaccine based on its connection to abortion was "not part of a comprehensive religious belief system" because other Catholics accepted the Covid-19 vaccine.

218. The Defendant considered Catholic applicants, including Plaintiff, who objected to the Covid-19 vaccine to have "personal beliefs" which were not required by the tenets of Catholicism.

219. And on this basis, the Defendant denied Catholic applicants, including Plaintiff religious accommodations to the Vaccine Mandate.

220. But Defendant approved religious accommodations for Christian Scientists and Jehovah's Witnesses.

221. This is because Defendant viewed refusal of vaccination to be central to those faiths, but not central to Catholicism.

222. The City's accommodation policy disproportionately impacted members of certain religious groups, particularly Catholics, whose applications were more likely to be denied based on the City's reliance on official statements from religious leaders.

223. The City summarily denied religious accommodation requests without conducting a meaningful inquiry into the sincerity of Plaintiff's religious beliefs, instead of applying a

blanket standard that presumed such beliefs to be insincere or invalid based on the City's view of the connection between the vaccine and abortion.

224. The Defendant considered the public comments made by those they considered the religious leaders of applicant's religions when deciding religious accommodation requests.

225. The Defendant drew arbitrary distinctions about whether opposition to a vaccine tested on fetal cell lines constituted a valid religious objection, asserting that the Plaintiff's beliefs were invalid because the stemmed from opinions expressed by others in their faith community.

226. The City denied plaintiff's request for a religious accommodation after concluding that Plaintiff's religious opposition to the covid-19 vaccine, due to its connection to aborted fetal cell lines, was invalid because the connection was "too remote."

227. In doing so, the City substituted its own assessment of moral culpability for the Plaintiff's sincerely held religious belief.

228. In processing accommodation requests, the City required applicants to provide detailed theological explanations for their beliefs and assessed the reasonableness of these beliefs, fostering excessive entanglement between the government and religious doctrine.

229. The City's accommodation policy, as applied, automatically denied religious accommodation requests from individuals identifying as Catholic, on the grounds that the Catholic Church does not officially prohibit the vaccine.

230. The City did not investigate or consider the individual's sincerely held beliefs, instead relying on a blanket policy that dismissed objections rooted in Catholic teachings about abortion.

231. The City favored certain interpretations of Catholic teachings, accepting vaccine compliance as consistent with Catholic doctrine while rejecting individual Catholic's interpretation of their religious obligations.

232. This created a preference for one religious viewpoint over another within the same faith tradition.

233. In adjudicating religious accommodation requests, the City evaluated religious beliefs through the lens of its own policy definitions and thresholds, imposing a standard of reasonableness and alignment with organizational or denominational positions that effectively excluded claims from individuals who did not meet these criteria.

234. This discriminated against Catholics like Plaintiff, who automatically were disqualified from receiving a religious exemption on this basis.

235. The City's application of its accommodation policies disproportionately impacted Catholic applicants by denying requests from Catholics who cited religious objections to the vaccine's connection to abortion, without considering the sincerity of their individual beliefs.

236. The City denied religious accommodations en masse for individuals who identified with specific faith traditions, including Catholicism, based on its presumption that members of these faiths could not sincerely object to the vaccine if their religious leaders did not explicitly forbid it.

237. The City determined that the objections to the vaccine based on its development or testing using aborted fetal cell lines were invalid if the applicant did not also state explicit objections to other products that the City deemed to have tested in similar ways, without even asking the applicant about any other products.

238. The City automatically presumed that applicants used over the counter medications and received other vaccinations if their applications did not explicitly address these matters, even though the City never instructed applicants to provide such information.

239. The City made automatic negative assumptions about applicants who objected to the Covid-19 vaccine based upon its development of testing using aborted fetal cell lines, including those applicants must reject other over the counter medications and other vaccinations.

240. The City presumed that applicants' use of over-the-counter medications or other vaccines necessarily violated their religious beliefs in the same way as the Covid-19 vaccine, without considering that these products may have been tested on fetal cell lines by third parties after their creation, not by their manufacturers as part of their development or production.

241. The City ignored the nuanced nature of religious beliefs, assuming that an applicant who objected to the Covid-19 vaccine on the basis of its direct development and testing using fetal cell lines would necessarily hold the same objection to certain over the counter medications that may been tangentially connected through independent, post production testing.

242. The City's denial of religious accommodations relied on an unsupported presumption of inconsistent conduct by applicants failing to recognize that an applicant can sincerely distinguish between complicity in the development and production of a product versus its incidental use after the fact.

243. The City did not even consider what the applicant, including the Plaintiff, knew to be true or was aware of regarding any alleged connection between abortion and over-the-counter medications.

244. By presuming that applicants who used over the counter medications or other vaccines were acting inconsistently with their religious beliefs, the City effectively dismissed the sincerity of applicant's objections without conducting an individualized assessment of their knowledge, beliefs, or intent.

245. The City never provided applicants with specific instructions to disclose their use of over-the-counter medications or other vaccines, yet presumed that any omission of such information indicated insincerity or inconsistency in their religious objections.

246. By accepting religious objections only if they met specific, City defined criteria, the City endorsed certain religious interpretations while dismissing others, effectively favoring particular religious viewpoints.

247. The City's refusal to recognize legitimate religious objections coerced employees into receiving the vaccine despite their deeply held religious beliefs, under threat of termination or placement on Leave Without Pay.

248. Defendant denied Plaintiff's religious accommodation request because they relied upon public statements by the Pope.

249. Defendant did not have any objective basis to doubt the sincerity of plaintiff's religious beliefs regarding Covid-19 vaccines.

250. Defendant did not have any objective basis to doubt the religious nature of Plaintiff's religious beliefs regarding Covid-19 vaccines.

251. Defendant never communicated to Plaintiff that his sincerity or the religious nature of his objection was in question.

252. Defendant did not ask Plaintiff any questions about his reasonable accommodation requests.

253. The Defendant had unchecked authority in determining which religious beliefs merit accommodation.

254. It was the Defendant's policy to reject applicants' religious beliefs if they were based on abortion.

255. The Defendant's denied applicants who made abortion-based objections to the Covid-19 vaccine and judged those beliefs as inaccurate and implausible.

256. The Defendant refused to accept the validity of applicant's individual interpretations of their religious creeds.

257. The Defendant denied applicants if they did not show that refusal of vaccination was mandated by their religion.

258. Defendant refused to acknowledge a "conflict" where an applicant's religion did not explicitly require the refusal of vaccines.

259. Defendant denied Plaintiff's request on the grounds that, under the City's written policies and practices, religious objections to the COVID-19 vaccine by Catholics were dismissed as "personal preferences".

260. Defendant took the position that Catholics could not hold sincere religious beliefs contrary to the Pope's endorsement of the vaccine.

261. Defendant denied Plaintiff because the "leader" of his religious organization, i.e., the Pope, spoken publicly in favor of the vaccine.

262. Defendant denied Plaintiff because he did not submit a clergy letter.

263. The Defendant's accommodation policies only allowed for religious accommodations for applicants who were members of religions that they deemed recognized and established religious organizations with longstanding objections to all vaccinations.

264. And the Second Circuit found the standards the City used in deciding religious accommodation requests to the Vaccine Mandate for teachers were neither generally applicable nor neutral, and did not "survive strict scrutiny." *Kane v. De Blasio*, 19 F.4th 152, 169 (2d Cir. 2021). The Second Circuit held that the City's policies violated the Free Exercise Clause, specifically rejecting the requirements that exemption requests be considered only for recognized and established religious organizations, and that requests be denied if the religious leader supports the vaccine, if documentation is readily available online, or if the objection is personal, political, or philosophical. *Id.* at 168-69.

265. The City did not disavow this policy and subsequently expanded it as an official written option to various City agencies, despite the Second Circuit's determination that it was unconstitutional.

266. And the City openly defended its continued policy of denying Catholic employees' accommodation requests based upon the Pope's opinion of the COVID-19 vaccine. For example, in the case of Catholic New York City Police Detective who applied for a religious accommodation to the Vaccine Mandate based upon the use of aborted fetal cell lines and his religious opposition to abortions based upon his Catholic faith, the City rejected his religious objection, stating that his "claims, including that taking the currently available vaccines would violate principles of his Catholic faith, are not based in the very religion to which he allegedly maintains a sincerely held religious belief." *Furno v. New York City Police Dep't*, Index No.: 85021/2023, NYSCEF Doc. No. 31, March 2, 2023 at p. 16. The City explained:

> Petitioner claims he is a "conscientious and devout Catholic" and that he "cannot in good conscience accept a vaccine, which employs cell lines derived from aborted fetuses as it violates fundamental aspects of his Catholic faith." Yet Petitioner ignores the reality that the Catholic faith, as attested to by the Sovereign Pontiff Francis ("Pope Francis") advocates for vaccination against Covid-19. Pope Francis has explicitly stated that the Covid-19 vaccine is "authorized by respective authorities" and is an "act of love." Indeed

> Pope Francis himself, arguably Catholicism's most prominent physical embodiment of the "Holy Spirit" foo concern to Petitioner herein, has been vaccinated against Covid-19. Moreover, the Vatican's Congregation for the Doctrine of the Faith stated, "It is morally acceptable to receive Covid-19 vaccines that have used cell lines from aborted fetuses in their research and production process," and further, "all vaccinations recognized as clinically safe and effective can be used in good conscience with the certain knowledge that the use of such vaccines does not constitute formal cooperation with the abortion from approved by Pope Francis."

*Id.* at p. 15-16.

267. The City and DSNY were aware that Equal Employment Opportunity Commission ("EEOC") guidance stated that an employer should generally assume that an employee's request for a religious accommodation is based on a sincerely held religious belief, and that when the accommodation request itself does not provide enough information to make a determination, and the employer has doubt as to the basis of the accommodation request, the agency EEO Officer is entitled to make a limited inquiry, in order to identify the specific religious belief, observance, or practice that conflicted with the Vaccine Mandate.

**Citywide Panel's Denial:**

268. On January 4, 2022, Mr. Maiorino was notified by DCAS that the Citywide Panel denied his appeal.

269. There was no reasoning provided for the denial: "The City of New York Reasonable Accommodation Appeals Panel has carefully reviewed your Agency's determination, all of the documentation submitted to the agency and the additional information you submitted in connection with the appeal. Based on this review, the Appeals Panel has decided to deny your appeal. This determination represents the final decision with respect to your reasonable accommodation request. The decision classification for your appeal is as follows: *Does Not Meet Criteria."*

270. The Citywide Panel clearly indicated that it had reviewed the additional information Plaintiff submitted on appeal and did not limit its review to the documentation submitted in Plaintiff's original request to the DSNY.

271. The Citywide Panel never communicated with Plaintiff outside of the denial he received.

272. The Citywide Panel never asked plaintiff for any information regarding his history of vaccination or medication refusal.

273. A history of vaccination or medication refusal is not required to qualify for a religious accommodation to the Vaccine Mandate.

274. The Citywide Panel denial letter did not provide any reason or rationale for the denial.

275. The Citywide Panel did not find Plaintiff's religious beliefs to be insincere.

276. The Citywide Panel did not ask plaintiff any questions about the sincerity of his religious beliefs.

277. The Citywide Panel did not consider any potential accommodations as this was the role of the DSNY.

278. Defendant had no objective basis for questioning the religious nature of Plaintiff's religious beliefs.

279. Defendant had no objective basis for questioning the sincerity of Plaintiff's religious beliefs.

280. Plaintiff sufficiently articulated and explained the religious nature of his conflict with the Vaccine Mandate.

281. Defendant's summarily denied Plaintiff's request for accommodation without any

individualized consideration.

282. Defendant's did not consider plaintiff's individual job duties before refusing to accommodate him.

283. In addition to the January 4, 2022 e-mail from DCAS, on January 5, 2022, DSNY also emailed Plaintiff to inform him that the Citywide Panel denied his appeal.

284. On January 31, 2022, DSNY notified Plaintiff that he had been "placed on Leave Without Pay status due to [his] noncompliance with the Order of the Commissioner of Health and Mental Hygiene dated October 20, 2021 that all City employees provide proof of receipt of a COVID-19 vaccine", and that his "position with DSNY will be terminated if [he did] not submit proof of COVID-19 vaccine by 5:00pm on February 11, 2022.

285. The letter further stated that "[f]ailure to provide proof of vaccination by February 11, 2022 will result in the termination of [his] employment with DSNY."

286. On February 11, 2022, Plaintiff was terminated.

287. On March 29, 2023, the DSNY sent Mr. Maiorino a letter by overnight mail offering Mr. Maiorino "the opportunity to return to [his] employment if [he] become[s] fully vaccinated".

288. On or about February 9, 2023, the New York City Department of Health and Mental Hygiene amended the Vaccine Mandate, no longer requiring exclusion from the workplace for City Workers who do not provide proof of COVID-19 vaccination.

**The Defendant Cannot Demonstrate Undue Hardship**

289. DSNY granted religious accommodations to 314 DSNY employees.

290. Many of these 314 DSNY employees who were granted religious accommodations were Sanitation Workers, with the same job duties as the Plaintiff.

291. The Citywide Panel granted religious accommodations to 29 DSNY employees. These employees were denied by DSNY but the Citywide Panel overturned those denials.

292. All of the DSNY employees who were granted religious accommodations were granted an accommodation of the submission of a weekly negative PCR test.

293. The DSNY employees who were granted religious accommodations were permitted to continue working in person in their same job position, performing the same job duties.

294. The City, through DCAS and the Law Department, instructed DSNY that weekly testing could not be considered an undue hardship for DSNY employees.

295. Additionally, the City's written policies on the Vaccine Mandate identified weekly testing as the accommodation for the vaccine mandate.

296. These policies also stated that weekly testing could not create an undue hardship.

297. No DSNY employees were denied religious accommodations based on undue hardship.

298. As a matter of fact, according to the DSNY Director of the Office of Equity, Inclusion and Diversity, DSNY advised all reviewers of reasonable accommodation requests to the Vaccine Mandate not even to consider undue hardship when considering requests.

299. As long as an employee could satisfy the City's criteria for a religious accommodation, that employee received an accommodation of weekly testing.

300. Additionally, DSNY permitted hundreds of employees to continue working for months after the Vaccine Mandate went into effect while their accommodation requests and appeals were pending.

301. These employees were permitted to keep working while submitting weekly PCR testing.

302. Plaintiff himself was permitted to continue working in person while his accommodation request and appeal were pending.

303. This was a Citywide policy, and thousands of City employees were permitted to keep working after the Vaccine Mandate went into effect while their accommodation requests and appeals were pending.

304. Even 1,176 active duty firefighters (who slept in the firehouse, fought fires, and responded to medical emergencies) were permitted to continue working while their accommodation requests and appeals were pending.

305. DSNY also promulgated its Policy and Administrative Procedure 2021-03 regarding the Vaccine Mandate ("DSNY COVID-19 Policy"). The DSNY COVID-19 Policy stated that DSNY employees who were granted reasonable accommodations would have to submit proof of a weekly negative COVID-19 PCR test result. Employees could utilize on-site testing at DSNY locations or seek weekly tests elsewhere. In the event DSNY did not provide or ceased to provide on-site testing at DSNY locations, accommodated employees were eligible for up to three hours per week of excused leave for the purpose of receiving a weekly COVID-19 PCR test.

**Emotional and Financial Devastation**

306. Mr. Maiorino has adhered to his religious beliefs and has not taken the vaccine and has been unable, despite reasonable efforts, to find comparable employment.

307. Mr. Maiorino continues to suffer from the constant and persistent coercion of being forced to choose between upholding his cherished religious beliefs and returning to his employment.

308. As a result of his wrongful termination, Plaintiff suffered significant financial hardship. The sudden loss of income and benefits caused ongoing instability, including difficulty meeting basic living expenses, maintaining housing, and keeping up with utility payments.

309. 309. Plaintiff has been unable to obtain comparable employment since his termination, resulting in long-term economic insecurity and damage to his career trajectory.

310. 310. The termination and its aftermath have also caused severe emotional distress. Plaintiff has experienced anxiety, depression, and loss of self-esteem arising from the stigma of being terminated from a career to which he devoted more than fifteen years of public service.

311. 311. The loss of his position and the City's refusal to accommodate his religious beliefs have left Plaintiff feeling humiliated, betrayed, and alienated from the community he once served with pride.

312. 312. This ordeal has had lasting effects on his mental and physical well-being, diminishing his quality of life and undermining his sense of purpose and dignity

313.

**FIRST CAUSE OF ACTION**

**(Failure to Accommodate in Violation of the New York City Human Rights Law)**

314. Plaintiff reincorporates the foregoing as if fully written herein.

315. At all relevant times, the NYCHRL has been in full force and effect and has Pursuant to the NYCHRL, It shall be an unlawful discriminatory practice for an employer or an

employee or agent thereof to impose upon a person as a condition of obtaining or retaining employment any terms or conditions, compliance with which would require such person to

violate, or forego a practice of, such person's creed or religion, … and the employer shall make reasonable accommodation to the religious needs of such person. N.Y.C. Admin. Code § 8–107(3)(a).

316. At all relevant times, the Defendant had the power to hire, promote, and discharge Mr. Maiorino.

317. Mr. Maiorino has sincerely held religious beliefs which prohibit him from receiving the COVID-19 vaccines.

318. The Defendant required Mr. Maiorino to receive the COVID-19 vaccine to retain his employment.

319. Mr. Maiorino requested a reasonable accommodation to the Defendant's requirement that he receive the COVID-19 vaccination.

320. Mr. Maiorino requested a reasonable accommodation to the Defendant's requirement that he receive the COVID-19 vaccination.

321. Defendant denied Mr. Maiorino 's request for a reasonable accommodation.

322. Defendant failed to provide Mr. Maiorino with a reasonable accommodation of his religious observance, practice, and belief (i.e., that he is prohibited from taking the COVID-19 vaccine), which precludes him from complying with the Vaccine Mandate.

323. In 2005, the New York City Council amended the NYCHRL by passing the Local Civil Rights Restoration Act of 2005 (the "Restoration Act"), N.Y.C. Local L. No. 85. In amending the NYCHRL, the City Council expressed the view that the NYCHRL had been "construed too narrowly" and therefore "underscore[d] that the provisions of New York City's Human Rights Law are to be construed independently from similar or identical provisions of New York state or federal statutes." Restoration Act § 1. To bring about this

change in the law, the Act established two new rules of construction. First, it created a "one way ratchet," by which interpretations of state and federal civil rights statutes can serve only " 'as a floor below which the City's Human Rights law cannot fall.' " *Loeffler*, 582 F.3d at 278 (quoting Restoration Act § 1). Second, it amended the NYCHRL to require that its provisions "be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title[,] have been so construed." Restoration Act § 7 (amending N.Y.C. Admin. Code § 8–130). *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013); see also *Kerman-Mastour v. Fin. Indus. Regulatory Auth., Inc.,* 814 F. Supp.2d 355, 365-66 (S.D.N.Y. 2011) ("[T]he Second Circuit has directed the district courts to conduct an analysis of the NYCHRL claims that is separate from that undertaken for Title VII and New York State Human Rights Law claims." (citing *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278-79 (2d Cir. 2009)).

324. In 2011, New York City enacted the Workplace Religious Freedom Act, amending sections 8-102 and 8-107 of the NYCHRL, and adopting a stiffer standard for assessing undue hardship. The committee report accompanying this amendment stated that the City Council's intention is "to provide greater protection to workers under the City Human Rights Law than the federal, and even the State, human rights provisions provide." N.Y.C. Council, Report of Committee on Civil Rights on Proposed Int. No. 632, Aug. 16, 2011. "The standard for assessing undue hardship under the NYCHRL differs from that under federal law when considering requests for reasonable accommodation." COVID-19 & Employment Protections, "Vaccinations," NYC Human Rights, accessible at

https://www1.nyc.gov/site/cchr/community /covid-employment.page (last updated 11/1/2021).

325. The New York City Human Rights Law explicitly defines undue hardship: "Reasonable accommodation", as used in this subdivision, shall mean such accommodation to an employee's or prospective employee's religious observance or practice as shall not cause undue hardship in the conduct of the employer's business. The employer shall have the burden of proof to show such hardship. "Undue hardship" as used in this subdivision shall mean an accommodation requiring significant expense or difficulty (including a significant interference with the safe or efficient operation of the workplace or a violation of a bona fide seniority system). N.Y.C. Admin. Code § 8-107(3)(b).

326. Mr. Maiorino was able to perform the essential duties of his job with a reasonable accommodation.

327. Accommodating the Mr. Maiorino would not require significant expense or difficulty from the Defendant.

328. Accommodating Mr. Maiorino would not significantly interfere with the safe or efficient operation of the Defendant's workplace.

329. Accommodating the Mr. Maiorino would not require the Defendant to violate a bona fide seniority system.

330. Defendant accommodated other DSNY employees with weekly PCR testing. The

NYCHRL prohibits Defendant from denying Mr. Maiorino 's request for a reasonable accommodation until it engaged in a cooperative dialogue with the Mr. Maiorino: The determination that no reasonable accommodation would enable the person requesting an accommodation to satisfy the essential requisites of a job or enjoy the right or rights in question

may only be made after the parties have engaged, or the covered entity has attempted to engage, in a cooperative dialogue. N.Y.C. Admin. Code § 8-107 (28)(e).

331. However, Defendant violated the NYCHRL by denying Mr. Maiorino 's request for a reasonable accommodation without engaging in a cooperative dialogue.

332. Instead of accommodating Mr. Maiorino 's religious beliefs, Defendant terminated Mr. Maiorino because he could not receive the COVID-19 vaccination.

333. Instead of accommodating Mr. Maiorino 's religious beliefs, Defendant placed Mr. Maiorino on LWOP because he could not receive the COVID-19 vaccination.

334. Mr. Maiorino was terminated because the Defendant refused to accommodate his religious beliefs.

335. Defendant had no objective basis for questioning the religious nature of Mr. Maiorino 's religious beliefs.

336. Defendant had no objective basis for questioning the sincerity of Mr. Maiorino 's religious beliefs.

337. Mr. Maiorino sufficiently articulated and explained the religious nature of his conflict with the Vaccine Mandate.

338. Defendant simply rejected Mr. Maiorino 's religious beliefs without reason.

339. Defendant discriminated against Mr. Maiorino because he is Catholic.

340. Defendant cannot demonstrate that accommodating Mr. Maiorino would cause an undue hardship.

341. Defendant accommodated other DSNY employees in the same or similar position as the Mr. Maiorino.

342. Defendant permitted other DSNY employees to submit weekly PCR testing instead of receiving the COVID-19 vaccination.

343. As a direct and proximate result of Defendant's unlawful discriminatory practices, Mr. Maiorino has suffered, and continues to suffer, substantial losses, including but not limited to the loss of past and future earnings, compensation and benefits, increases, promotions, bonuses, and other employment benefits, for which he is entitled to an award of monetary damages which exceeds the jurisdictional limits of all lower courts, and other relief.

344. As a direct and proximate result of Defendant's failure to accommodate, Mr. Maiorino suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages in an amount to be determined at trial.

345. As a direct and proximate result of Defendant's failure to accommodate, Mr. Maiorino is thus entitled to injunctive and declaratory relief, as well as compensatory damages, including pain and suffering, and punitive damages for the injuries and loss sustained as a result of Defendant's unlawful discriminatory conduct under the NYCHRL, in an amount to be determined at trial.

346. Defendant willfully violated Mr. Maiorino 's right to a reasonable accommodation.

347. Defendant willfully violated Mr. Maiorino 's right to a cooperative dialogue.

348. Defendant willfully violated Mr. Maiorino 's right to an interactive process.

349. Defendant willfully and wrongfully terminated Mr. Maiorino .

350. Defendant knew they were acting in violation of the law.

351. The City promulgated guidance to private sector employers regarding religious accommodation requests to the City's COVID-19 Vaccine Mandate, and acknowledged the refusal to receive the COVID-19 vaccine based upon the use of aborted fetal cell lines in the testing, research, development, and/or manufacturing of the vaccines.

352. The Defendant knew that they were required under the law to engage in a good faith discussion with Mr. Maiorino in an attempt to understand his accommodation needs. However, the Defendant did not engage in such good faith interactive process or cooperative dialogue.

353. The Defendant knew that Mr. Maiorino 's beliefs qualified as religious under the law. There is no common sense reading of his request where Mr. Maiorino 's objection to the Vaccine Mandate is not based on sincerely held religious beliefs. However, Defendant categorically rejected Mr. Maiorino 's religious beliefs.

354. The City's FAQ on New York City Employees Vaccine Mandate recognized that "[a] sincerely held religious, moral or ethical belief may be a basis for a religious accommodation."

355. Defendant knew that they were legally required to engage in a cooperative dialogue but failed to engage in such dialogue with Mr. Maiorino regarding his request for an accommodation before summarily denying his request.

356. Defendant knew that they were legally required to engage in an interactive process but failed to engage in such process with Mr. Maiorino regarding his request for an accommodation before summarily denying his request.

357. Defendant violated their own employment policies and procedures by failing to engage in a cooperative dialogue with Mr. Maiorino .

358. Defendant violated their own employment policies and procedures by failing to

engage in an interactive process with Mr. Maiorino .

359. Defendant violated their own employment policies and procedures by refusing to accommodate the Mr. Maiorino .

360. Defendant violated their own employment policies and procedures by denying Mr. Maiorino 's beliefs were religious.

361. Defendant did not consider the Mr. Maiorino 's individual job duties before refusing to accommodate him.

362. Defendant callously rejected the Mr. Maiorino 's request for accommodation displaying a blatant lack of any true consideration before hastily issuing a boilerplate denial.

363. Defendant acted with malice.

364. Defendant's actions amount to willful or wanton negligence.

365. Defendant's discrimination was willful.

366. Defendant's discrimination was reckless.

367. Defendant consciously disregarded Mr. Maiorino 's right to a reasonable accommodation.

368. Defendant consciously disregarded Mr. Maiorino 's right to a cooperative dialogue.

369. Defendant consciously disregarded Mr. Maiorino 's right to an interactive process.

370. Defendant consciously disregarded Mr. Maiorino 's right to retain his employment.

371. Defendant's conduct was so reckless as to amount to a conscious disregard of the rights of the Mr. Maiorino .

372. Defendant acted with reckless indifference to Mr. Maiorino 's rights.

373. As a direct and proximate result of Defendant's conduct, Mr. Maiorino is entitled to punitive damages under NYCHRL in an amount to be determined at trial.

374. Mr. Maiorino is further entitled to an award of attorney's fees, expert fees, and other costs under the NYCHRL. N.Y.C. Admin. Code §8-502(g).

**SECOND CAUSE OF ACTION**

**(Failure to Accommodate in Violation of the NYSHRL)**

375. Plaintiff reincorporates the foregoing as if fully written herein.

376. At all relevant times, the NYSHRL has been in full force and effect and has applied to Defendant's conduct.

377. The NYSHRL provides: It shall be an unlawful discriminatory practice for any employer, or an employee or agent thereof, to impose upon a person as a condition of obtaining or retaining employment, including opportunities for promotion, advancement or transfers, any terms or conditions that would require such person to violate or forego a sincerely held practice of his or her religion, including but not limited to the observance of any particular day or days or any portion thereof as a sabbath or other holy day in accordance with the requirements of his or her religion or the wearing of any attire, clothing, or facial hair in accordance with the requirements of his or her religion, unless, after engaging in a bona fide effort, the employer demonstrates that it is unable to reasonably accommodate the employee's or prospective employee's sincerely held religious observance or practice without undue hardship on the conduct of the employer's business. N.Y. Executive Law § 296(10)(a).

378. "Undue hardship" is defined as "an accommodation requiring significant expense or difficulty (including significant interference with the safe or efficient operation of the workplace…)." N.Y. Executive Law § 296(10)(d).

379. If the undue hardship is alleged based on a safety concern, "the employer must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective information to ascertain: the nature, duration and severity of the risk; the probability that the potential injury will actually occur, and whether reasonable accommodations, such as modification of policies, practices or procedures, will mitigate the risk." 9 CRR-NY 466.11.

380. At all relevant times, the Defendant were employers of the Mr. Maiorino .

381. Mr. Maiorino has sincerely held religious beliefs which prohibit him from receiving the COVID-19 vaccines.

382. The Defendant required Mr. Maiorino to receive the COVID-19 vaccine to retain his employment.

383. Mr. Maiorino requested a reasonable accommodation to the Defendant's requirement that he receive the COVID-19 vaccination.

384. Defendant rejected Mr. Maiorino 's religious beliefs without reason.

385. Defendant had no objective basis for questioning the religious nature of Mr. Maiorino 's religious beliefs.

386. Defendant had no objective basis for questioning the sincerity of Mr. Maiorino 's religious beliefs.

387. Mr. Maiorino sufficiently articulated and explained the religious nature of his conflict with the Vaccine Mandate.

388. Defendant simply rejected Mr. Maiorino 's religious beliefs without reason.

389. Defendant discriminated against Mr. Maiorino because he is Catholic.

390. Defendant denied Mr. Maiorino 's request for a reasonable accommodation.

391. Defendant failed to provide Mr. Maiorino with a reasonable accommodation of his religious observance, practice, and belief (i.e., that he is prohibited from taking the COVID-19 vaccine), which precludes him from complying with the Vaccine Mandate.

392. Mr. Maiorino was able to perform the essential duties of his job with a reasonable accommodation.

393. Accommodating the Mr. Maiorino would not require significant expense or difficulty from the Defendant.

394. Accommodating the Mr. Maiorino would not significantly interfere with the safe or efficient operation of the Defendant's workplace.

395. Accommodating the Mr. Maiorino would not require the Defendant to violate a bona fide seniority system.

396. Defendant failed to engage in any interactive process with Mr. Maiorino regarding his accommodation request.

397. Defendant failed to engage in good faith with the Mr. Maiorino in order to understand his need for accommodation.

398. Defendant unreasonably cut off any dialogue with the Mr. Maiorino regarding his religious beliefs.

399. Mr. Maiorino , while working twelve-hour shifts multiple days a week, sufficiently articulated his sincerely held religious beliefs to the Defendant.

400. Defendant's requirements for demonstrating a sincerely held religious belief that conflicts with the Vaccine Mandate are unreasonable and unlawful.

401. Defendant violated the NYSHRL by denying Mr. Maiorino 's request for a reasonable accommodation without first engaging in an interactive process.

402. Instead of accommodating Mr. Maiorino 's religious beliefs, Defendant terminated Mr. Maiorino because he could not receive the COVID-19 vaccination.

403. Instead of accommodating Mr. Maiorino 's religious beliefs, Defendant placed Mr. Maiorino on LWOP because he could not receive the COVID-19 vaccination.

404. Defendant refused to allow Mr. Maiorino to keep his job because he could not receive the COVID-19 vaccine without violating his religious beliefs.

405. Mr. Maiorino was terminated because the Defendant failed to consider any reasonable accommodations to the Vaccine Mandate.

406. Even after the Vaccine Mandate has been amended by the New York City Department of Health and Mental Hygiene, Defendant failed and refused to eliminate its discriminatory policies and practices and failed and refused to remedy the effects of Mr. Maiorino's termination and placement on LWOP.

407. As a direct and proximate result of Defendant's failure to accommodate, Mr. Maiorino has suffered, and continues to suffer, substantial losses, including but not limited to the loss of past and future earnings, compensation and benefits, increases, promotions, bonuses, and other employment benefits, for which he is entitled to an award of monetary damages which exceeds the jurisdictional limits of all lower courts, and other relief.

408. As a direct and proximate result of Defendant's failure to accommodate, Mr. Maiorino suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages in an amount to be determined at trial.

409. Mr. Maiorino is thus entitled to injunctive and declaratory relief, as well as

compensatory and punitive damages for the injuries and loss sustained as a result of Defendant's unlawful discriminatory conduct under the NYSHRL, in an amount which exceeds the jurisdictional limits of all lower courts.

410. Defendant willfully violated Mr. Maiorino 's right to a reasonable accommodation.

411. Defendant willfully violated Mr. Maiorino 's right to a cooperative dialogue.

412. Defendant willfully violated Mr. Maiorino 's right to an interactive process.

413. Defendant willfully and wrongfully terminated Mr. Maiorino .

414. Defendant knew they were acting in violation of the law.

415. The City promulgated guidance to private sector employers regarding religious accommodation requests to the City's COVID-19 Vaccine Mandate, and acknowledged the refusal to receive the COVID-19 vaccine based upon the use of aborted fetal cell lines in the testing, research, development, and/or manufacturing of the vaccines.

416. The Defendant knew that they were required under the law to engage in a good faith discussion with Mr. Maiorino in an attempt to understand his accommodation needs. However, the Defendant did not engage in such good faith interactive process or cooperative dialogue.

417. The Defendant knew that Mr. Maiorino 's beliefs qualified as religious under the law. There is no common sense reading of his request where Mr. Maiorino 's objection to the Vaccine Mandate is not based on sincerely held religious beliefs. However, Defendant categorically rejected Mr. Maiorino 's religious beliefs.

418. The City's FAQ on New York City Employees Vaccine Mandate recognized that "[a] sincerely held religious, moral or ethical belief may be a basis for a religious accommodation."

419. Defendant knew that they were legally required to engage in a cooperative dialogue but failed to engage in such dialogue with Mr. Maiorino regarding his request for an accommodation before summarily denying his request.

420. Defendant knew that they were legally required to engage in an interactive process but failed to engage in such process with Mr. Maiorino regarding his request for an accommodation before summarily denying his request.

421. Defendant violated their own employment policies and procedures by failing to engage in a cooperative dialogue with Mr. Maiorino .

422. Defendant violated their own employment policies and procedures by failing to engage in an interactive process with Mr. Maiorino .

423. Defendant violated their own employment policies and procedures by refusing to accommodate the Mr. Maiorino .

424. Defendant violated their own employment policies and procedures by denying Mr. Maiorino 's beliefs were religious.

425. Defendant did not consider the Mr. Maiorino 's individual job duties before refusing to accommodate him.

426. Defendant callously rejected the Mr. Maiorino 's request for accommodation displaying a blatant lack of any true consideration before hastily issuing a boilerplate denial.

427. Defendant acted with malice.

428. Defendant's actions amount to willful or wanton negligence.

429. Defendant's discrimination was willful.

430. Defendant's discrimination was reckless.

431. Defendant consciously disregarded Mr. Maiorino 's right to a reasonable

accommodation.

432. Defendant consciously disregarded Mr. Maiorino 's right to a cooperative dialogue.

433. Defendant consciously disregarded Mr. Maiorino 's right to an interactive process.

434. Defendant consciously disregarded Mr. Maiorino 's right to retain his employment.

435. Defendant's conduct was so reckless as to amount to a conscious disregard of the rights of the Mr. Maiorino.

436. Defendant acted with reckless indifference to Mr. Maiorino 's rights.

437. As a direct and proximate result of Defendant's conduct, Mr. Maiorino is entitled to punitive damages under the NYSHRL in an amount to be determined at trial.

438. Mr. Maiorino is further entitled to an award of attorney's fees, expert fees, and other costs under the NYSHRL. Executive Law § 297(10).

**THIRD CAUSE OF ACTION**

**(Failure to Engage in a Cooperative Dialogue in Violation of the NYCHRL)**

439. Plaintiff reincorporates the foregoing as if fully written herein.

440. The NYCHRL requires employers to engage in a cooperative dialogue with an employee who requests a reasonable accommodation on the basis of religion.

441. The NYCHRL provides a separate cause of action against employers who fail to engage in a cooperative dialogue with employees, like the Mr. Maiorino , who request a reasonable accommodation: It shall be an unlawful discriminatory practice for an employer, labor organization or employment agency or an employee or agent thereof to refuse or otherwise fail to engage in a cooperative dialogue within a reasonable time with a person who has requested an

accommodation or who the covered entity has notice may require such an accommodation: (1) For religious needs as provided in subdivision 3 of this section. N.Y.C. Admin. Code § 8-107 (28)(a).

442. Defendant were obligated to engage in a cooperative dialogue with Mr. Maiorino regarding his need for a reasonable accommodation to the Vaccine Mandate.

443. Defendant refused to engage in any cooperative dialogue and simply denied Mr. Maiorino 's request for a reasonable accommodation.

444. Defendant violated N.Y.C. Admin. Code § 8-107 (28)(a)(1) by failing to engage in a cooperative dialogue with the Mr. Maiorino regarding his request for a reasonable accommodation to the Vaccine Mandate.

445. The NYCHRL prohibits Defendant from denying the Mr. Maiorino 's request for a reasonable accommodation until it engaged in a cooperative dialogue with the Mr. Maiorino: The determination that no reasonable accommodation would enable the person requesting an accommodation to satisfy the essential requisites of a job or enjoy the right or rights in question may only be made after the parties have engaged, or the covered entity has attempted to engage, in a cooperative dialogue. N.Y.C. Admin. Code § 8-107 (28)(e).

446. However, Defendant violated the NYCHRL by denying Mr. Maiorino 's request for a reasonable accommodation without first engaging in a cooperative dialogue.

447. Mr. Maiorino sufficiently articulated sincerely held religious beliefs that conflict with the Vaccine Mandate.

448. Mr. Maiorino was fully capable of satisfying the essential requisites of his job with a reasonable accommodation.

449. The Defendant never had any communications with Mr. Maiorino regarding his accommodation needs before denying his reasonable accommodation request.

450. Defendant never had any communications with Mr. Maiorino regarding any potential accommodations that may address his accommodation needs before denying his reasonable accommodation request.

451. Defendant never had any communications with Mr. Maiorino regarding alternatives to his accommodation request before denying his reasonable accommodation request.

452. Defendant never had any communications with Mr. Maiorino regarding the difficulties that any potential accommodations may pose to Defendant before denying his reasonable accommodation request.

453. As a direct and proximate result of Defendant's unlawful discriminatory practices, Mr. Maiorino has suffered, and continues to suffer, substantial losses, including but not limited to the loss of past and future earnings, compensation and benefits, pension contributions, increases, promotions, bonuses, and other employment benefits, for which he is entitled to an award of monetary damages which exceeds the jurisdictional limits of all lower courts, and other relief

454. As a direct and proximate result of Defendant's unlawful discriminatory practices, Mr. Maiorino suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages in an amount to be determined at trial.

455. As a direct and proximate result of Defendant's violations of the NYCHRL, N.Y.C. Admin. Code § 8-107 (28)(a)(1) and § 8-107 (28)(e), Mr. Maiorino is entitled to declaratory and injunctive relief and Defendant are liable to Mr. Maiorino for compensatory damages, including pain and suffering, and punitive damages in an amount to be determined at trial pursuant to N.Y.C.

Admin. Code §8-502(a), and for costs and reasonable attorney's fees pursuant to N.Y.C. Admin. Code §8-502(g).

## FOURTH CAUSE OF ACTION

(Violation of the Free Exercise Clause of the First Amendment of the United States Constitution)

**(Violation of the Free Exercise Clause of the First Amendment of the United States Constitution)**

456. Plaintiff reincorporates all preceding and subsequent statements set forth in this Complaint as if fully written herein.

457. Plaintiff hereby brings this complaint against Defendant, alleging violations of his constitutional rights under the First Amendment through the United States Constitution.

458. The Free Exercise Clause of the First Amendment to the United States Constitution prohibits the government's burdening of a sincerely held religious belief. The First Amendment provides, in pertinent part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. Const. amend. I.

459. "[A] law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny." *Church of the Lukumi Babalu Aye, Inc.v. Hialeah*, 508 U.S. 520, 546 (1993). A non-neutral or non-generally applicable law must be the least restrictive means available to further a compelling government interest in order to withstand strict scrutiny.

460. The First Amendment, applicable to state and local governments through the Fourteenth Amendment, prohibits government actors from infringing on religious liberty or favoring one religion over another.

461. As a direct and proximate result of Defendant's actions, plaintiff suffered and continues to

suffer irreparable harm including but not limited to emotional distress, last of pecuniary interest, loss of employment, financial harm, including specific damages of loss of pay and employment benefits.

**Religious Belief and Practice**

462. Plaintiff is a Roman Catholic who holds sincerely held religious beliefs that prohibit him from receiving a COVID-19 vaccination.

463. Plaintiff's beliefs are not novel, arbitrary, or pretextual, but rather reflect a consistent and genuine adherence to religious doctrines that preclude his receiving a vaccine that conflict with his conscience and faith.

464. Defendant implemented a COVID-19 vaccine mandate applicable to Plaintiff's employment. This mandate categorically required vaccination as a condition of continued employment.

**Government action:**

465. Defendant enacted standards, policies, and procedures governing the religious accommodation

process that substantially burdened plaintiff's ability to freely exercise his religion.

466. Defendant adopted and enforced standards, policies, and procedures governing the religious accommodation process that required applicants—including Plaintiff—to submit to intrusive and unconstitutional inquiries into the legitimacy, orthodoxy, and acceptability of their religious beliefs.

467. Defendant adopted, applied and enforced standards, policies, and procedures governing the religious accommodation process that required applicants—including Plaintiff— to obtain clergy letters attesting to the doctrinal validity of their beliefs; demonstrate alignment with institutional religious authorities (e.g., the Pope's public approval of the vaccine); satisfy doctrinal

consistency standards rather than the proper legal standard of "sincerely held belief" and other constitutionally infirm requirements

468. Plaintiff attempted to seek a reasonable accommodation and/or redress for their religious exercise including specific request to the Defendant.

469. Defendant's actions have significantly interfered with plaintiff's ability to practice his religion as he sees fit, including the denial by the Defendant of a reasonable religious accommodation.

470. The Defendant applied these unconstitutional standards policies, and procedures Governing the religious accommodation process and uniformly denied religious accommodations that otherwise should not have been denied.

**Substantial burden:**

471. As a direct result of Defendant's policy standards, policies, and procedures governing the religious accommodation process, Plaintiff was placed on involuntary leave without pay and ultimately terminated for his refusal to violate his sincerely held religious beliefs.

472. The Defendant's policy standards, policies, and procedures governing the religious accommodation process and the denial of Plaintiff's request for a reasonable accommodation substantially burden Plaintiff's free exercise of religion.

473. The Defendant's policy standards, policies, and procedures governing the religious accommodation process and the denial of Plaintiff's request for a reasonable accommodation substantially burden Plaintiff's free exercise of religion by coercing him to choose between adhering to his religious convictions or facing adverse employment action, including job loss, LWOP, reputational harm, and economic hardship.

474. The Defendant's policy standards, policies, and procedures governing the religious accommodation process and the denial of Plaintiff's request for a reasonable

accommodation substantially burden Plaintiff's free exercise of religion in that compliance would require violation of his religious beliefs as the sole alternative to suffering adverse employment actions—including LWOP and termination.

**Compelling Government Interest:**

475. Defendant's policy standards, policies, and procedures governing the religious accommodation process does not serve a compelling government interest, nor is it least restrictive means of achieving that interest as required by the strict scrutiny standard under the First Amendment.

476. The Defendant actions were not justified by a compelling government interest.

477. The burden was neither incidental nor constitutionally permissible, as the policy intruded on Plaintiff's internal religious deliberation, dictated the acceptable parameters of his belief system, and denied meaningful opportunity for exemption.

**Narrow Tailoring:**

478. The Defendant's specific application of the vaccine mandate's exemption process to Plaintiff was not justified by a compelling government interest in this context.

479. Defendant's standards, policies, and procedures governing the religious exemption process were not narrowly tailored. Less restrictive means—such as regular PCR testing, masking, social distancing, and remote work accommodations—were feasible, previously available, and constitutionally required before impinging upon First Amendment rights.

480. *Defendant's abandonment of the "test or vax" policy in favor of a categorical mandate without meaningful religious exemptions represents a failure to employ the least restrictive means of achieving any stated interest.*

**Neither neutral nor generally applicable.**

481. The standards, policies, and procedures governing the religious accommodation process adopted by the Defendant for evaluating religious accommodation requests were **neither neutral nor generally applicable**.

482. The standards, policies, and procedures governing the religious accommodation process employed by the Defendant for evaluating religious accommodation requests were **neither neutral nor generally applicable**.

483. These standards, policies, and procedures governing the religious accommodation process

included **constitutionally impermissible criteria**, such as: Requiring Catholic employees to demonstrate agreement with the Pope's stance on vaccination, contrary to *Thomas v. Review Board*, 450 U.S. 707 (1981) (holding that the government may not question the validity or consistency of religious beliefs); Requiring submission of a **clergy letter**, regardless of the fact that the First Amendment protects sincerely held beliefs whether or not they are espoused by clergy or part of organized religion, *Frazee v. Illinois Dept. of Employment Sec.*, 489 U.S. 829 (1989); Evaluating the **"veracity" or "accuracy"** of an applicant's religious beliefs rather than assessing whether the beliefs were sincerely held.

484. Defendant individually assessed the reasons that Plaintiff refused the COVID-19 vaccination, and decided Plaintiff's religious beliefs were not worthy of a religious exemption.

485. Defendant refused to acknowledge the Plaintiff's and other City Workers' religious objections as conflicting with the Vaccine Mandate.

486. In particular, Defendant refused to acknowledge any abortion-based objections to the COVID-19 vaccination, rejecting these objections as not constituting a religious conflict.

487. Defendant claimed that any religious objections based upon abortion were incorrect and therefore, not valid.

488. Defendant relied upon the Pope's public comments on the COVID-19 vaccine when denying Roman Catholic applicants like Plaintiff.

489. Defendant refused to acknowledge the religious nature of an objection to the COVID-19

vaccination, mischaracterizing Plaintiff's (and other City Workers') objections as merely personal preferences.

490. Defendant passed judgment on Plaintiff's religious beliefs and presupposed the illegitimacy of those beliefs and practices.

491. Defendant incorrectly compared Plaintiff's belief to others.

492. Defendant discriminated against the Plaintiff because he is a Roman Catholic.

493. Defendant refused to accommodate Plaintiff because he is a Roman Catholic.

494. Defendant denied applicants whose views they disagreed with, including the Plaintiff.

495. Defendant improperly preferred certain religious sects when granting religious exemptions to the Vaccine Mandate.

496. Defendant gave preferential treatment to similarly situated employees who also remained unvaccinated for religious reasons.

497. Defendant singled out Plaintiff by refusing to acknowledge that his beliefs are religious, while allowing others with religious objections from certain religious sects to continue working.

498. Defendant are hostile to Plaintiff's religious beliefs because Plaintiff is not a member of one of the Defendant's "preferred sects."

499. The Defendant limited religious exemptions to applicants who belonged to established, organized religions which had a long-standing public history of opposition to vaccination.

500. Defendant demonstrated a hostility to Plaintiff's religious practices and beliefs.

501. The Defendant improperly segregated Plaintiff from others with religious objections to the Vaccine Mandate by allowing applicants with certain religious beliefs to continue working while submitting to weekly testing but terminating Plaintiff.

502. Defendant demonstrated animus to Plaintiff's specific religious practices in burdening Plaintiff's religious exercise while allowing other religious objectors to continue working.

503. Defendant implemented the Vaccine Mandate standards, policies, and procedures

governing the religious accommodation process in a discriminatory manner by implementing denominational preferences for certain religious sects, such as Christian Scientists and Jehovah's Witnesses, and other sects that the Defendant recognize as established.

504. Defendant refused to provide Plaintiff with a religious accommodation based on their unilateral determination regarding the religious necessity of refusing the COVID-19 vaccination.

505. Defendant refused to provide Plaintiff with a religious accommodation based on their personal interpretations of the correctness of Plaintiff's religious beliefs and practices.

506. Defendant refused to provide Plaintiff with a religious accommodation based on their personal interpretations of the plausibility of Plaintiff's religious understandings.

507. Defendant substituted their judgment regarding what Plaintiff's faith requires.

508. Defendant denied Plaintiff based on the rejection of the verity of his religious beliefs.

509. Defendant do not have a compelling interest in requiring Plaintiff to violate his sincerely held religious beliefs as a result of the inconclusive functionality of the available COVID-19 vaccines in preventing viral transmission, carry, and illness.

510. Moreover, Defendant's interest in mandating Plaintiff to be vaccinated cannot be compelling where other employees are provided reasonable accommodations for both religious and medical reasons.

511. Less restrictive means to reduce the spread of COVID-19 are available to the Defendant, including masking, PCR testing, antibody testing, temperature checks, Light Duty, offline position, remote work, among others. As such, the Defendant's COVID-19 vaccination mandate standards, policies, and procedures governing the religious accommodation process fails strict scrutiny.

512. Terminating Plaintiff was not the **least restrictive means** of stemming the spread of COVID-19.

513. Terminating Plaintiff imposed discipline on Plaintiff for exercising his right to free exercise of his religious beliefs.

**Damages:**

514. Defendant's actions injured and continue to injure Plaintiff by chilling his religious activity through the withholding of pay, discipline, termination, LWOP, and the refusal to reinstate Plaintiff to his prior employment position.

515. Plaintiff is entitled to a declaration that the Defendant violated his First Amendment right to the free exercise of religion.

516. Plaintiff is entitled to equitable relief.

517. Further, Plaintiff is entitled to reasonable costs of this lawsuit, including attorneys' and experts' fees pursuant to 42 U.S.C. § 1988 and other applicable law, as well as compensatory damages, including pain and suffering, against the Defendant, including emotional distress and pain and suffering in an amount to be proven at trial. The U.S. Supreme Court has held that individual damages are available against violators. *Tanzin v. Tanvir*, 141 S. Ct. 486 (2020).

518. Defendant's violation of Plaintiff's religious exercise evidenced an indifference to and a reckless disregard of Plaintiff's religious rights.

519. Defendant's actions injured and continue to injure Mr. Maiorino by chilling his religious activity through the withholding of pay, discipline, termination, and the threat of termination.

520. Mr. Maiorino is entitled to a declaration that the Defendant violated his First Amendment right to the free exercise of religion. Mr. Maiorino is entitled to equitable relief and an injunction, reinstating him to his previous position of employment and enjoining the Defendant from taking any adverse employment actions against him due to his vaccination

status. Further, Mr. Maiorino is entitled to reasonable costs of this lawsuit, including attorneys' and experts' fees pursuant to 42 U.S.C. § 1988 and other applicable law, as well as compensatory damages, including pain and suffering, and punitive damages against the Defendant, including emotional distress and pain and suffering in an amount to be proven at trial. The U.S. Supreme Court has held that individual damages are available against violators. *Tanzin v. Tanvir*, 141 S. Ct. 486 (2020).

521. A court must consider: "(1) degree of reprehensibility of the Defendant's conduct, (2) relationship of the punitive damages to the compensatory damages, and (3) criminal and civil penalties imposed by the state's law for the misconduct in question." *Jennings v. Yurkiw*, 18 F.4th 383, 390 (2d Cir. 2021) (quoting *Payne v. Jones*, 711 F.3d 85, 101 (2d Cir. 2013)).

522. Defendant's violation of Mr. Maiorino 's religious exercise evidenced an indifference to and a reckless disregard of his religious rights.

523. The harm caused was not only economic but also a danger to his health. Defendant's

deliberate actions to sever his employment demonstrate a reckless disregard for his physical and mental/psychological health.

524. The Defendant's disregard for his sincerely held religious beliefs, refusal to engage in meaningful dialogue, and intentional termination have catalyzed a cascade of damages for defendant.

525. Defendant's actions demonstrated a reckless disregard for his overall well-being,

prioritizing compliance with the Vaccine Mandate over the profound implications their decisions had on his physical and mental health. This level of recklessness speaks to a broader indifference to the health and safety of their employees.

526. Mr. Maiorino is financially vulnerable. As a dedicated and hardworking middle-class individual, Mr. Maiorino 's livelihood is intricately tied to his role as a blue-collar Sanitation Worker. Dependent upon his salary to sustain his basic needs and maintain his modest lifestyle, any disruption to his income has profound consequences for his financial stability. By depriving him of the opportunity to continue his employment, they have thrust him into a state of economic vulnerability that he was ill-prepared to endure. The termination of his employment, without just cause or consideration for his deeply held convictions, has left him grappling with the challenge of making ends meet, jeopardizing his ability to provide for his own well-being and meet his financial obligations

527. The Defendant's conduct involved repeated actions. The DSNY failed to engage in a cooperative dialogue and interactive process. The DSNY failed to accommodate. The Citywide Panel failed to engage in a cooperative dialogue and interactive process. The Citywide Panel failed to accommodate.

528. The harm Mr. Maiorino suffered was the result of intentional malice, trickery, and deceit. Mr. Maiorino 's pursuit of an accommodation was met with deliberate malice, cunning deception, and a flagrant lack of good faith on the part of the Defendant. Despite his earnest efforts to clarify and elaborate on his deeply-held religious convictions, the Defendant intentionally withheld essential guidance, leaving him in the dark about the precise nature of the information they sought. The deliberate omission of specific criteria or clarifications rendered Mr. Maiorino 's attempts at compliance futile and bound to fail.

529. Furthermore, the Defendant's failure to engage in meaningful and sincere dialogue with Mr. Maiorino showcases a calculated effort to obstruct the accommodation process. Their intentional refusal to seek understanding or facilitate the provision of a reasonable accommodation demonstrates a calculated disregard for his rights and well-being.

530. This calculated malice is further compounded by the deceptive manipulation of Mr. Maiorino 's situation. By failing to elucidate the parameters for his accommodation and leaving him without recourse for clarification, the Defendant set him up for a predetermined failure. This intentional trickery and manipulation not only undermined his genuine efforts to uphold his religious beliefs but also perpetuated an atmosphere of unjust treatment.

531. In this trifecta of intentional malice, trickery, and deceit, the Defendant have exhibited a clear disregard for Mr. Maiorino 's rights, well-being, and the sincere pursuit of a reasonable accommodation. Their actions are emblematic of a calculated and reprehensible approach that meets the threshold for punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays that this Court grant judgment to him containing the following relief:

**A.** A declaratory judgment that the Defendant's failure to accommodate and failure to engage in a cooperative dialogue with Plaintiff are unlawful discriminatory practices under the New York City Human Rights Law and the New York State Human Rights Law;

**B.** A declaratory judgment that the Defendant's actions have violated the Plaintiff's First Amendment right to the Free Exercise of religion;

**C.** An order that Defendant reinstate Plaintiff to his former position with full seniority, status, salary increments, bonuses and benefits, to the same extent that he would have received but for Defendant's unlawful conduct;

**D.** An order that Defendant grant Plaintiff's request for a reasonable accommodation that will allow Plaintiff to perform the essential functions of his job;

**E.** An award to Plaintiff of compensatory damages for the Plaintiff's lost wages, back pay, front pay, overtime, and benefits, in an amount to be determined at trial;

**F.** An award to Plaintiff of compensatory damages for the pain and suffering, humiliation, mental anguish, damages to reputation and livelihood, and emotional distress sustained by him in an amount to be determined at trial;

**G.** An award to Plaintiff for costs in this action, including reasonable attorney's fees and expert fees under 42 U.S.C. §1988, the New York City Human Rights Law, and New York State Human Rights Law;

**H.** An award to Plaintiff for the deprivation of his right to be free from religious discrimination under the federal Constitution and state and federal law;

**I.** An award to Plaintiff of compensatory damages to address the financial consequences of Defendant's discriminatory and unlawful acts;

**J.** An award to Plaintiff for punitive damages in an amount to be determined at trial, in order to punish the Defendant's intentional unlawful discriminatory practices;

**K.** An order for civil fines and penalties pursuant to New York Executive Law § 297(9);

**L.** An award of pre- and post-judgment interest on all amounts awarded to the Plaintiff at the highest rates and from the earliest dates allowed by law on all causes of action; and

**M.** Such other and further relief this Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and Rule 38(b) of the Local Rules, Plaintiff demands trial by jury for all the issues leaded herein so triable.

Dated: Staten Island, New York
November 3, 2025

Respectfully submitted,

______________________

Christina Martinez, Esq
MARTINEZ & LOIACONO, PLLC
245 Bricktown Way, Suite J
Staten Island NY 10309
T: (347) 215-4543
ChristinaMartinezEsq@gmail.com